TOWN OF NORWOOD,
MASSACHUSETTS,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Yankee Atomic Electric Company,
Intervenor.

No. 94–1710.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1995.

Decided April 9, 1996.

Charles F. Wheatley, Annapolis, MD, argued the cause for petitioner, with whom Don C. Uthus and Timothy P. Ingram were on the briefs.

Edward S. Geldermann, Bethesda, MD, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jerome M. Feit, Washington, DC, Solicitor, and Joseph S. Davies, Deputy Solicitor, were on the brief.

Kenneth G. Jaffe, Washington, DC, was on the brief for intervenor Yankee Atomic Electric Company.

Before: WALD, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

After Yankee Atomic Electric Company shut down a nuclear power plant before the plant's license expired, the Federal Energy Regulatory Commission allowed Yankee to recover from ratepayers 100% of its remaining unamortized investment, construction-work-in-progress, decommissioning costs, and the operating expenses of the closed plant. To reflect the plant shutdown, the Commission also reduced Yankee's rate of return. The Town of Norwood, one of Yankee's ratepayers, now seeks review of the Commission's order. In view of both the language of the service contract between Norwood and Yankee and the substantial savings to ratepayers from the shutdown of the plant, we find that the Commission's decision to allow Yankee 100% recovery of its investment and other expenses was neither arbitrary nor capricious. We find, however, that in establishing a new rate of return to reflect the reduced risks facing Yankee, the Commission's determination that it could not go below the previously established zone of reasonableness was arbitrary. We therefore set aside the order and remand for the setting of a new zone of reasonableness.

I.

Yankee Atomic Electric Company owns an electric power production facility in Rowe, Massachusetts, which began operating in 1961 under a Nuclear Regulatory Commission license that expires on July 9, 2000. All of Yankee's stock is owned by ten Northeast utility companies. Known as "purchaser-owners," these ten companies are parties to a "Power Contract" with Yankee that allows Yankee to charge all of its operating costs to customers. The Town of Norwood, the petitioner in this case, is a customer of New England Power Company, one of the parties to the Power Contract.

In response to Nuclear Regulatory Commission concerns about the safety of the Rowe plant's reactor vessel, Yankee voluntarily shut down the plant in October 1991. Four months later, after conducting a study that showed that the costs of restarting the plant and operating it through the remainder of its license exceeded the value of the energy the plant could produce, Yankee's board of directors voted to close the plant permanently. Yankee then filed with the Federal Energy Regulatory Commission an Amendment to each Power Contract authorizing Yankee to include in its rate base 100% of the $48.4 million of investment in the Rowe plant that it would have recovered if it had operated the plant through July 2000. Yankee also sought to recover its post-shutdown operating and maintenance expenses (about $68.9 million). The Amendment also allowed Yankee to maintain its 12% rate of return on equity.

When several Yankee customers, including Norwood, intervened to oppose the Amendment, the Commission suspended Yankee's rate filing to decide whether the Amendment was just and reasonable. *Yankee Atomic Elec. Co.*, 60 F.E.R.C. ¶ 61,104, at 61,334 (1992) (order granting intervention). The

Commission scheduled a hearing to determine whether the shutdown decision was prudent, and whether Opinion No. 295—in which the Commission held that investors could not recover from ratepayers more than 50% of their investment in a plant canceled before operation—applied to the Yankee shutdown. *Id.* at 61,332–35 (citing *New England Power Co., Opinion No. 295*, 42 F.E.R.C. ¶ 61,016, *reh'g denied in part and granted in part, Opinion No. 295–A*, 43 F.E.R.C. ¶ 61,285 (1988)). Yankee's subsequent offer of settlement was accepted by all intervening customers except Norwood. *See Yankee Atomic Elec. Co.*, 65 F.E.R.C. ¶ 63,-001, at 65,002 (1993) (ALJ decision).

Relying on Yankee's study which showed that ceasing plant operations would save ratepayers at least $116 million, the ALJ assigned to hear Norwood's challenges concluded that Yankee's decision to shut down the plant was prudent. *Id.* at 65,005. The ALJ also found that extending the license beyond 2000 rather than closing the plant would require Yankee to spend $23 million to obtain a license extension and another $50 to $100 million to purchase a new reactor vessel, and that these costs exceeded other power supply alternatives. *Id.* at 65,004. Determining that Yankee was not entitled to recover 100% of its costs, the ALJ developed an "equitable sharing" formula under which Yankee could recover 82.3% of its unamortized investments and post-shutdown operating and maintenance expenses and 50% of construction-work-in-progress. *Id.* at 65,-011–13. The ALJ also rejected Norwood's request that Yankee lower its rate of return on equity, finding no evidence that Yankee's business and financial risks had decreased because of the shutdown. *Id.* at 65,016.

The Commission rejected the ALJ's "equitable sharing" formula. It found that the original Power Contract—as interpreted in Opinion No. 285, a prior Commission opinion—guaranteed Yankee 100% recovery of its unamortized investments and operating and maintenance expenses in the event of premature termination. *Yankee Atomic Elec. Co., Opinion No. 390*, 67 F.E.R.C. ¶ 61,318, at 62,112–13 (1994) (affirming ALJ decision) (citing *Yankee Atomic Elec. Co., Opinion No. 285*, 40 F.E.R.C. ¶ 61,372 (1987), *aff'd in part, modified in part, and rev'd in part, Opinion No. 285–A*, 43 F.E.R.C. ¶ 61,232, 1988 WL 412405 (1988)). Noting that utility investors are "generally entitled to recoup from consumers the full amount of their investment," *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 485 F.2d 786, 808 (D.C.Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), the Commission concluded that 100% recovery for Yankee was "just and reasonable." 67 F.E.R.C. at 62,113. Denying Yankee full recovery, the Commission reasoned, would give utilities perverse incentives to operate power plants until they recouped their investment, even though retiring the plant might be more cost-effective. *Id.* at 62,114. The Commission also granted Yankee 100% recovery of its construction-work-in-progress. Noting that limiting construction-work-in-progress to 50% was logical for plants under construction that had never provided service to customers, the Commission approved full recovery for Yankee because its investments "were made in an attempt to assure that an already used and useful plant could continue to remain used and useful." *Id.* at 62,115.

As to the rate of return, the Commission disagreed with the ALJ, finding instead that the shutdown had decreased Yankee's risk and that Yankee's rate should therefore be reduced. *Id.* at 62,120–21. Rejecting the rates proposed by its own staff and by Norwood, the Commission proposed instead 9.86%. However, because the Commission concluded that the zone of reasonableness established in its prior order, Opinion No. 285, remained binding, it reduced Yankee's rate only to 10.75%, the lower end of the zone. *Id.* at 62,122. Following denial of its petition for rehearing, Norwood filed the petition for review that is before us now.

II.

We set aside Commission orders only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1994), or if not supported by substantial evidence, 16 U.S.C. § 825l(b) (1994). With these principles in mind, we

turn to Norwood's challenge to the Commission's decision.

■ Norwood first challenges the Commission's holding that Section 6 of the Power Contract between Yankee and New England Power Company authorizes full recovery. Section 6 states:

> ... [T]he Customer will pay Yankee an amount equal to the Customer's power percentage of the total cost of service for such month to all customers of Yankee.
>
> The "total cost of service" for any month shall be the sum of (a) Yankee's operating expenses for such month with respect to the plant, plus (b) an amount equal to one-twelfth of the composite percentage for such month of the net plant rate base.
>
> ... [F]or purposes of this contract "operating expenses" shall include (i) depreciation accrued at a rate at least sufficient to fully amortize the non-salvageable plant investment over the estimated remaining useful life of the plant....

The Commission ruled that Section 6's provision requiring payment of depreciation over the plant's useful life authorizes Yankee to recover all of its remaining investment in the plant as well as its on-going operating expenses. Because the useful life of the Rowe plant has ended, the Commission interpreted Section 6 to allow Yankee immediate recovery of its remaining investment as depreciation. According to the Commission, the Amendment simply allows Yankee to make that recovery over a period of time.

Norwood claims that the vote by the purchaser-owners to shut down the plant terminated the parties' obligations under the Contract, including any obligation under Section 6. For this argument, Norwood relies on Section 2 of the Contract which provides:

> [I]f the stockholders of Yankee, by a vote of not less than 75% in interest of the outstanding stock having general voting rights, shall at any time vote to discontinue the operation of the plant or to liquidate Yankee and wind up its affairs, the obligations of the parties [under this contract] shall thereupon terminate.

According to Norwood, Yankee may therefore only charge ratepayers for post-termination costs authorized under Section 2: final billings and the costs of decommissioning the plant.

Norwood is correct that Section 6 of the Contract does not explicitly allow Yankee to charge ratepayers for its unamortized investment or other costs in the event of premature termination. However, Section 6 does authorize Yankee to collect, as part of its "total cost of service," depreciation "to fully amortize the non-salvageable plant investment over the estimated remaining useful life of the plant." Because the shutdown ended the "useful life" of the Rowe plant, the Commission's reading of Section 6 to allow Yankee to recover its remaining investment in the plant is reasonable. *See Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991) (court should defer to Commission's reasonable construction of ambiguous provision of filed contract). Because Section 6 of the Power Contract allows Yankee to include construction-work-in-progress in its rate base, the Commission reasonably found Yankee entitled to recover these costs as well.

Norwood argues that the Contract terminated with the Board's decision to close the plant. According to Section 2 of the Contract, the Contract can only be terminated by 75% of the *shareholders.* As the Commission found, however, the record contains no evidence that a *shareholder* vote took place, only that Yankee's *board of directors* decided to shut down the plant. Yankee's efforts to amend the Contract supports the Commission's conclusion that no termination occurred; as the Commission observed, "[i]t would have been pointless for Yankee to amend the Power Contracts ... if [they] had been terminated by a vote of Yankee's shareholders." *Yankee Atomic Elec. Co., Opinion No. 390,* 67 F.E.R.C. at 62,115 n. 85. In any case, we need not reach that question because our conclusion would be the same even if the shareholders had terminated the Power Contract. Section 2 of the Contract authorizes collection of "final billings and adjustments ... with respect to all other obligations of the parties hereunder." Since payment of the undepreciated value of the plant is part of Norwood's payment "obli-

gation" under Section 6 of the Contract, in the event of termination, Yankee could collect the payment as a "final billing."

The Commission's reading of the Contract as guaranteeing full recovery is consistent with its earlier construction of the Contract in Opinion No. 285. *Yankee Atomic Elec. Co., Opinion No. 285,* 40 F.E.R.C. ¶ 61,372 (setting rate of return). The issue there was whether Yankee's rate of return (then 14.5%) had become excessive. In deciding to lower the company's rate of return, the Commission rejected Yankee's argument that its investors bore the risk of premature shutdown, instead interpreting the Power Contract to place this risk on ratepayers. *Id.* at 62,207 (stating that if the plant ceases operation, "the purchasers are then obligated to pay the full costs of decommissioning and all final bills, including the undepreciated value of the plant").

■ We conclude, moreover, that the Commission's decision to authorize full recovery was just and reasonable and consistent with Commission policy. We are unpersuaded by Norwood's argument that forcing ratepayers to pay for a plant no longer producing electricity conflicts with the regulatory precept that ratepayers should only pay for items "used and useful" in providing service. Although a utility's rate base normally consists only of items presently "used and useful," *see New England Power Co. Mun. Rate Comm. v. FERC,* 668 F.2d 1327, 1333 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982), a utility may include "prudent but canceled investments" in its rate base as long as the Commission reasonably balances consumers' interest in fair rates against investors' interest in "maintaining financial integrity and access to capital markets," *Jersey Cent. Power & Light Co. v. FERC,* 810 F.2d 1168, 1178 (D.C.Cir.1987). In reaching its decision in this case, the Commission had before it evidence that the plant had benefitted ratepayers by providing efficient service for 31 years, and that shutting down the plant would save ratepayers more than $100 million. Because full recovery permits Yankee's investors to recoup their remaining investment in the plant while producing savings for

ratepayers, the Commission reasonably concluded that full recovery serves the interests of investors *and* ratepayers.

■ Norwood claims that the Rowe Plant shutdown will not generate any savings for customers. Although not challenging the ALJ's determination that the shutdown was prudent, Norwood contends that Yankee's cost study considered only the "variable costs" of obtaining energy from additional sources (fuel and operating costs), neglecting "capacity costs" (the overhead costs of adding new generating capacity). Evidence before the Commission, however, showed that sufficient generating capacity was available from other plants in New England; building new generating facilities was therefore not necessary. *See Yankee Atomic Elec. Co., Opinion No. 390-A,* 68 F.E.R.C. at 62,470. Norwood offers no evidence to lead us to question the Commission's acceptance of Yankee's cost study. In the alternative, Norwood contends that if sufficient generating capacity exists elsewhere, the Rowe plant constituted "excess generating capacity," which, because not "used and useful" to consumers, may not be included in the rate base. Although the Commission may require investors rather than ratepayers to bear the cost of reserve generating capacity in excess of 20%, *see City of Batavia v. FERC,* 672 F.2d 64, 74–75 (D.C.Cir.1982) (upholding inclusion in rate base of 30.8% excess generating capacity), Norwood has neither provided evidence of the precise amount of reserve generating capacity in the system nor shown any imprudence by Yankee, *see Illinois Cities v. FERC,* 670 F.2d 187, 200–01 & n. 59 (D.C.Cir.1981) (sustaining inclusion of 30.2% excess capacity in rate base in the absence of any showing of "managerial imprudence").

Next, Norwood argues that permitting Yankee 100% recovery conflicts with Opinion No. 295, *New England Power Co., Opinion No. 295,* 42 F.E.R.C. at 61,082, which allows investors to recover no more than 50% of their prudently incurred investment in plants canceled before operation, and with Order No. 298, FERC Stats. & Regs., Regulation Preambles 1982–1985, ¶ 30,455, at 30,490 (1983), limiting investors' recovery of construction-work-in-progress of canceled plants

to 50%. In Opinion No. 295, the Commission reasoned that to the extent that 50% recovery exposed investors to higher risks, investors could simply "demand a greater risk premium" from ratepayers. *New England Power Co., Opinion No. 295-A*, 43 F.E.R.C. at 61,780. According to Norwood, that is exactly what happened here. It claims that, for the past three decades, Yankee's investors have earned a return on equity that compensates them for the risk of loss, and thus that they are not entitled to 100% recovery plus a continued return for a plant no longer serving its customers.

■ We find nothing unreasonable in the Commission's conclusion that Opinion No. 295's recovery rule for plants abandoned before operation does not apply where, as here, the plant has served ratepayers for decades. Although ratepayers generally "bear the expense of depreciation" and although investors generally "are entitled to recoup from consumers the full amount of their investment in depreciable assets devoted to public service," *Democratic Cent. Comm.*, 485 F.2d at 808, Opinion No. 295 makes a logical exception to this full recovery rule for plants abandoned before operation; in such cases, ratepayers have not benefitted from the plant. The situation here is quite different. Because customers have benefitted from the operation of the plant for over 30 years, and because ceasing plant operations will benefit customers by lowering rates, such an exception is unwarranted. Moreover, applying Opinion No. 295's recovery rule would not, as it would in the case of a plant that never began operations, promote economic efficiency. Indeed, it would have the opposite effect. Denying full recovery would likely give investors an incentive to operate plants until they recouped all of their investment even though closing the plant would save ratepayers money. In any event, and contrary to Norwood's assertions, Yankee's rate of return has not compensated Yankee for the risk of premature termination. In Opinion No. 285, the Commission explicitly refused to augment Yankee's rate of return to compensate for the risk of premature closure. *See Yankee Atomic Elec. Co., Opinion No. 285*, 40 F.E.R.C. at 62,207.

As to construction-work-in-progress, until Order No. 298, the Commission had completely excluded the cost of financing the construction of new plants because they were not yet "used and useful" to ratepayers. *See Mid–Tex Elec. Coop., Inc. v. FERC*, 773 F.2d 327, 331 (D.C.Cir.1985). Reversing this policy in Order No. 298, the Commission reasoned that because consumers "derive a present benefit—assurance of adequate future service—from construction work in progress," including some of the plant's costs in the rate base did not conflict with the "used and useful" principle. *Mid–Tex Elec.*, 773 F.2d at 346.

We agree with the Commission that Order No. 298 does not restrict full cost recovery in this case. For one thing, the Power Contract between Yankee and its customers explicitly authorizes including construction-work-in-progress in the rate base. Moreover, Yankee's capital improvements to the structure of the plant—replacing worn plant components and improving the plant's efficiency—"were made in an attempt to assure that an already used and useful plant could continue to remain used and useful." *Yankee Atomic Elec. Co., Opinion No. 390*, 67 FERC at 62,115. This is quite different from the situation before the Commission in Order No. 298 which involved the construction of a new plant that had yet to provide any benefits to customers. As Yankee's witness testified, "various components of a nuclear power plant will typically have to be replaced" and "plant performance can also be improved if new components are installed." *Yankee Atomic Elec. Co.*, 65 F.E.R.C. at 65,012 (internal quotation marks omitted). Forbidding full recovery of these sorts of investments in plants that are already operational might discourage companies whose licenses are about to expire from making capital improvements necessary to keep their plants safe and fuel-efficient.

■ Pointing out that it has only been a Yankee customer since 1985 (the last six of the plant's 31 years of operation), Norwood finally argues that, because the Commission's justification for full recovery rests on the notion that the plant has provided efficient service to customers for 31 years, the Com-

mission should assess against Norwood no more than six thirty-firsts of Yankee's unamortized costs. The primary rationale for allowing Yankee 100% recovery, however, is the language of the Power Contract to which New England Power is a party. As the Commission explained, by becoming a customer of New England Power, Norwood assumed the obligations of the Power Contract and can therefore "reasonably be required to bear, through the pass-through in rates of New England Power Company's costs, the risks and the costs associated with the premature shutdown of the Rowe plant." *Yankee Atomic Elec. Co., Opinion No. 390–A,* 68 F.E.R.C. at 62,474. We find nothing in the Power Contract to exempt Norwood from the obligations shared by all other ratepayers.

In sum, we find that the Commission's order granting Yankee full recovery of its remaining unamortized investment in the plant and construction-work-in-progress was reasonable. We have considered Norwood's remaining challenges to full cost recovery and find them without merit.

### III.

This brings us to Norwood's challenge to the Commission's refusal to set Yankee's rate of return below the zone of reasonableness established in Opinion No. 285. To establish a new rate of return, the Commission must find: "(1) that the existing rate is not just and reasonable, and (2) that a different rate is just and reasonable." *Yankee Atomic Elec., Opinion No. 285,* 40 F.E.R.C. at 62,206 (setting rate of return). Our role in reviewing the rate of return on equity is " 'to insure that the Commission's judgment is supported by substantial evidence and that the methodology used in arriving at that judgment is either consistent with past practice or adequately justified.' " *City of Batavia,* 672 F.2d at 85 (quoting *Public Serv. Comm'n v. FERC,* 642 F.2d 1335, 1351 (D.C.Cir.1980), *cert. denied,* 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981)); *see also Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1943) (Challenger "carries the heavy burden of . . . showing that [the rate order] is . . . unjust and unreasonable.").

In 1987, in Opinion No. 285, the Commission defined a zone of reasonableness for Yankee's return on equity. Because Yankee's stock is not publicly traded, the Commission set the upper end of the zone by calculating the rates of return of Yankee's purchaser-owners (such as New England Power Company), and then reducing the rate to reflect the lower risks facing Yankee. To determine purchaser-owner rates of return, the Commission relied on discounted cash flow analysis—in which a utility's dividend growth rate is added to the dividend yield of the utility's stock, "resulting in a total rate of return to the hypothetical buyer of the company's stock." *Public Serv. Comm'n v. FERC,* 813 F.2d 448, 463 (D.C.Cir.1987). Using this methodology, the Commission set the upper end of the range at 13.5%. It set the lower end at 10.75%, using as a benchmark the average rate of return on longer-term U.S. Treasury Bonds, then adding premiums for the various risks that Yankee faced. *See Yankee Atomic Elec., Opinion No. 285,* 40 F.E.R.C. at 62,209–11. Averaging the lower and upper ends of the range and apparently rounding-off the result, the Commission set Yankee's rate at 12%. *Id.* at 62,211.

Norwood argues here, as it did before the Commission, that to reflect the reduction of risk due to the shutdown of the plant, Yankee's rate should be 3.25% or, at the very most, 8.95%. For this argument, Norwood relies on the testimony of its expert witness who proposed several rates of return linked to the amount of unamortized investment the Commission allowed Yankee to recover. *See Yankee Atomic Elec. Co.,* 65 F.E.R.C. at 65,013 (ALJ decision). The expert calculated that if the Commission approved 100% recovery, Yankee would have no risk of loss, and thus the rate of return should be equivalent to a risk-free investment, which he determined to be the rate of return on commercial paper. This was the source of the 3.25% recommendation. *Id.* at 65,013. The expert offered the 8.95% recommendation if the Commission required Yankee to bear all the costs. *Id.* at 65,014.

Finding that the 6–month commercial paper rate was not the appropriate rate for

risk-free investments, and that Yankee's equity holders required a rate of return greater than the 9% cost of Yankee's debt, the ALJ rejected Norwood's expert's calculations as "unsupported and seriously flawed." *Id.* The ALJ also rejected the 8.95% alternative, finding that Norwood had not established that the expert's calculations were based on a consideration of both discounted cash flow and risk premium analysis, the methods the Commission used in Opinion No. 285. *Id.*

Like Norwood's expert, the Commission's Trial Staff witness also recommended a decrease in the rate of return, but only to 9%. *Id.* Reasoning that because discounted cash flow and risk-premium analyses involved "forward-looking" projections, the Trial Staff witness declined to use them, stating that they " 'may not be as useful dealing with a company that's not operating.' " *Id.* The Commission's witness concluded that approval of 100% of Yankee's final costs resulted in Yankee's equity holders having no more "business risk" than Yankee's bondholders. *Id.* at 65,015. He also concluded that Yankee had no financial risk "because no additional financing" was required, no operating risk because the plant was shut down, and no "decommissioning risk" because the "power contracts allow for periodic adjustment in decommissioning expenses." *Id.* The Commission's witness thus recommended fixing Yankee's rate of return at its cost of servicing its debt: 9%. Finding that Trial Staff had provided no empirical analyses to support its conclusions, the ALJ rejected the 9% recommendation. According to the ALJ, Yankee's financial risk may have actually increased following the shutdown decision: concerned about the purchasers' continued ability to pay the cost of service, Yankee's creditors had asked for additional compensation for existing loans and adherence to a strict payment schedule, and Moody's had lowered Yankee's bond rating. *Id.* The ALJ also observed that Yankee's business risk had not necessarily decreased because although day-to-day operating risks were certainly lower after shutdown, risks associated with decommissioning remained. For example, the costs of temporarily storing spent fuel and low-level waste might substantially increase until a permanent federal re-

pository site is found, "enhanc[ing] the possibility of a default by one or more of Yankee's purchasers/owners." *Id.* at 65,016.

Finding that both Norwood's expert and the Commission's Trial Staff had failed to establish that the existing rate was "unjust and unreasonable," the ALJ refused to lower Yankee's rate of return. *Id.* On review, the Commission rejected Norwood's proposed rates of return, agreeing with the ALJ that they were "unsupported and conclusory." *Yankee Atomic Elec. Co., Opinion No. 390,* 67 F.E.R.C. at 62,120. The Commission also rejected Trial Staff's 9% recommendation, stating that it was "not persuaded by the record in this case that Yankee's embedded cost of long-term debt is, as Staff argues, a reasonable proxy for its current cost of equity." *Id.* The Commission, however, agreed with Trial Staff that "[i]n the unique circumstance presented here ... the traditional [discounted cash flow] and risk premium methodologies may not be ... useful." *Id.* Analyzing the various risks facing Yankee, the Commission concluded that the shutdown and the Commission's decision allowing Yankee 100% recovery *had* substantially decreased Yankee's business and financial risks. *Id.* at 62,120–21. Taking account of the decrease in Yankee's risk and the decline in Treasury Bond interest rates, the Commission concluded that it should reduce Yankee's return on equity from 12% to 9.86%. *Id.* at 62,122. However, because the Commission found "the record in this proceeding ... insufficient to enable us to adjust the return on equity to a figure outside the zone of reasonableness established in Opinion No. 285," it reduced the rate only to the lower end of the range: 10.75%. *Id.*

■ We sustain the Commission's determination that Norwood's rate of return recommendations were "unsupported and conclusory." Norwood provided no support for its conclusion that Yankee's risk in the event of 100% recovery was equivalent to the 3.25% commercial paper market rate, nor did it explain why the commercial paper market rate was the appropriate benchmark. Although Norwood points to several exhibits as support for its claim, these exhibits simply restate the expert's recommendations with-

out showing how the expert derived them. The Commission's rejection of Norwood's recommendations was therefore reasonable and supported by substantial evidence.

█ We cannot say the same for the Commission's conclusion that it was bound by the "zone of reasonableness" established in Opinion No. 285. As the Commission itself found, because Yankee no longer operates its plant, its risks have decreased substantially. Moreover, the range of reasonableness established in Opinion No. 285 rested on discounted cash flow and risk premium methodologies, both of which the Commission found of no use in the unique circumstances facing Yankee—"a single-asset company which is no longer operating and which ... is 'contractually guaranteed recovery of virtually all costs associated with its principal asset.'" Commission Br. at 36 (quoting *Yankee Atomic, Opinion No. 390,* 67 F.E.R.C. at 62,120). Because Yankee's circumstances have changed drastically since Opinion No. 285, the Commission's continued adherence to the zone of reasonableness established there is arbitrary and capricious.

Our decision in *Union Electric Co. v. FERC,* 890 F.2d 1193 (D.C.Cir.1989), on which the Commission relies, is not to the contrary. *Union Electric* applies only to situations in which the Commission takes account of changes that occur between the ALJ's decision and the Commission's review of that decision. Under those circumstances, *Union Electric* holds that the Commission may not depart from the zone of reasonableness on the basis of the change without giving parties an opportunity to reopen the record. *See id.* at 1201–04. *Union Electric* does not prevent the Commission from establishing a new zone of reasonableness where, as here, the record is replete with evidence that the original zone of reasonableness is no longer viable. Faced with Yankee's changed circumstances due to the shutdown of the plant, the Commission should have developed a new zone of reasonableness either from the evidence before it or, if necessary, after supplementing the record.

We therefore set aside the order and remand to the Commission to develop a new zone of reasonableness that takes account of Yankee's reduced risk.

*So ordered.*