## LOUISIANA PUBLIC SERVICE COMMISSION, et al., Petitioners,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

**Arkansas Public Service Commission, et al., Intervenors.**

**No. 98–1088.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 8, 1999.

Decided April 13, 1999.

Michael R. Fontham argued the cause for petitioners. With him on the briefs were Noel J. Darce and George M. Fleming.

David H. Coffman, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.

Douglas G. Green argued the cause for intervenor Entergy Services, Inc. With him on the brief was J. Wayne Anderson.

Earle H. O'Donnell and Roger L. St. Vincent were on the briefs for intervenor Occidental Chemical Corporation.

Mary W. Cochran, Paul R. Hightower, Clinton A. Vince, and Glen L. Ortman were on the brief for intervenors City of New Orleans and Arkansas Public Service Commission.

Before: WALD, SILBERMAN, and GINSBURG, Circuit Judges.

·Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

FERC determined that Entergy Corporation had violated the inter-company formula tariff that it administers to equalize costs among its five parallel subsidiaries; the Commission declined, however, to order a refund from the subsidiaries that were undercharged by virtue of the tariff violation to the customers of the overcharged subsidiaries. The state regulatory bodies of Louisiana and Mississippi (the service areas of the overcharged subsidiaries), supported by an energy consumer as intervenor, petition for review of the Commission's order, contending that the Commission abused its discretion in declining to order a refund. We deny the petition.

## I.

Entergy Corporation owns five public utilities—Entergy Gulf States, Entergy Arkansas, Entergy Louisiana, Entergy New Orleans, and Entergy Mississippi—that provide electrical power to retail customers in Arkansas, Louisiana, Mississippi, and Texas. (Entergy Arkansas, alone among the subsidiaries, sells wholesale as well as retail power.) Entergy's subsidiaries are linked by more than common parentage: each subsidiary makes its capacity available to its sister companies as a backstop for when demand exceeds selfgenerated supply. Maintaining the availability of such capacity, of course, carries costs, even when it is not tapped for power generation. Since the subsidiaries' retail rates are set by state regulators based on principles of cost-of-service ratemaking, it would be inequitable—vis-a-vis a subsidiary's retail customers—for that subsidiary not to earn compensation from its sister companies when it keeps capacity on hand for them.

The Entergy subsidiaries' response to this problem of cost equalization *inter se* is

the System Agreement, a tariff that has been filed with and approved by the Commission pursuant to § 205 of the Federal Power Act (FPA), 16 U.S.C. § 824d (1994). One provision of the Agreement, known as the MSS-1 schedule, requires monthly payments from subsidiaries contributing less than their fair share of the System's total capacity to subsidiaries contributing more.[1] A company first determines its capability: the power that its "available" generating units—whether owned, leased or operated for its benefit—can generate in the month at issue. Next the company ascertains its responsibility ratio by dividing its use of power (self-generated and otherwise)—known as load responsibility— by the sum of all the individual companies' load responsibilities.[2] Then the company determines its proportionate share of total System capability—known as capability responsibility—by multiplying its responsibility ratio by the total System capability, and compares this figure to its actual capability for the month. If the company's actual capability is less than its capability responsibility, then the company is "short" and must make a monthly payment; if the company's actual capability exceeds its capability responsibility, then the company is "long" and will receive a monthly payment. The size of the payment is determined by multiplying the long company's MSS-1 rate—its average cost of oil and gas generating units based on the previous year's operating results—by the number of megawatts by which the company is long.[3]

As a formula rate tariff, the MSS-1 tariff's components may vary and hence the formula may dictate different equalization payments from month to month. Such changes do not, however, subject the Entergy system to the Federal Power Act's pre-filing and pre-approval require-ments for changes in a tariff; they are instead countenanced by FPA § 205(f), 16 U.S.C. § 824d(f), which governs automatic adjustment clauses. The retail rates charged by the subsidiaries to their customers are subject to state regulatory authority and operate quite differently. Apart from a fuel adjustment clause that allows for automatic changes in retail rates when fuel costs change, the retail rates are fixed by state regulators and remain in place until the regulators initiate a new rate case.

In 1985, when the current version of the System Agreement was approved by the Commission, there were four Entergy subsidiaries. Entergy Louisiana and Entergy New Orleans were consistently short; Entergy Arkansas and Entergy Mississippi consistently long. (A fifth subsidiary, Entergy Gulf States, joined the System in a merger approved in 1993.) Despite this imbalance among the subsidiaries in terms of *relative contribution* to System capability, circumstances were such that each subsidiary, in terms of *absolute need* for power given consumer demand, was maintaining a sizable number of operating units that were rarely (if ever) tapped for power generation. In 1986, Entergy's operating committee initiated the Extended Reserve Shutdown (ERS) program in the hope of reducing the costs of maintaining this unnecessary capacity. Under the program, some of the generating units would be identified as unnecessary for capacity needs, removed from active service, and preserved in a reserve status. It was hoped that the ERS program would allow the companies to reduce staffing and other operating and maintenance expenses that otherwise would have been required to maintain the units in a constant state of

1. These transactions are sales of electric energy at wholesale in interstate commerce, and hence are subject to the Commission's regulatory authority. *See* 16 U.S.C. § 824 (1994).

2. The company load responsibility, measured monthly, is a rolling 12-month average of the company's hourly loads, *i.e.*, sales of power,

coincident with the System's monthly peak hour load.

3. If there is more than one short company, the payment obligation is allocated based on the ratio of each short company's deficiency to the total deficiency of the short companies.

readiness, enable the companies to defer the cost of repairing broken units until it was necessary to bring the reserve units back on line, and obviate the need to construct costly new generating capacity to meet long-term requirements. Although Entergy contemplated retiring some of the ERS units rather than bringing them back on line, it intended to return many of the units to active service notwithstanding the 8–12 month period necessary to restore the ERS units. Forty percent of the units placed in ERS since the inception of the program in 1986 had been restored to active service by 1993.

The dispute before us stems not from Entergy's implementation of the ERS program itself, but rather from Entergy's decision to allow the individual companies to include ERS units within the category of "available" capability for purposes of cost equalization under the MSS–1 tariff. Recall that the higher a company's capability relative to the capabilities of its sister companies, the better off that company will be in terms of cost equalization under MSS–1. Under the version of the System Agreement then in place,

> A unit is considered available to the extent the capability can be demonstrated *and* (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling. A unit is considered unavailable if in the judgement of the Operating Committee it is of insufficient value in supplying system loads because of (1) obsolescence, (2) physical condition, (3) reliability, (4) operating cost, (5) start-up time required, or (6) lack of due-diligence in effecting repairs or nuclear refueling in the event of a scheduled or unscheduled outage.

*Entergy Servs.,* 80 F.E.R.C. ¶ 61,197, at 61,787 (1997) (footnote omitted) (emphasis in original). Entergy's Operating Committee interpreted "available" to include ERS units, which had the effect of improving the lot of those companies that had relatively more ERS-eligible units. That ben-

efitted Entergy Arkansas and Entergy New Orleans: in the period 1987–1993, Entergy Arkansas, which was long to begin with, became more long, and Entergy New Orleans, which was short to begin with, grew less short. Conversely, Entergy Mississippi and Entergy Louisiana were, at least in this respect, disadvantaged by virtue of the inclusion of ERS units in MSS–1: Entergy Mississippi, which was long to begin with, became less long, and Entergy Louisiana, which was short to begin with, became more short. (The inclusion of ERS units as "available" for MSS–1 purposes also bears on the MSS–1 rates of the long companies. As noted, that rate is the average cost per megawatt of the long company's oil and gas-fired generating units. A long company, by placing units into ERS, reduces the cost associated with those units and consequently reduces the average cost of all of its oil-and gas-fired generating units, and hence its MSS–1 rate.) Holding constant the number of units that each company actually put in ERS from 1987–1993, an Entergy officer determined that Entergy Mississippi received $8.8 million less, and Entergy Louisiana paid $10.6 million more, than would have been the case had ERS units been excluded from MSS–1.

Though inclusion of ERS units in the MSS–1 calculation began in 1986, neither the Commission nor any other party challenged the practice until 1993. One issue presented in FERC's review of the merger of Gulf States into the Entergy system as a fifth subsidiary was whether to allow Gulf States to include its then-existing ERS units as available capability for MSS–1 purposes before those units were returned to active service; the Commission decided that Gulf States should not receive credit for those ERS units because "there has been no historic practice of maintaining rough production cost equalization between Gulf States and the Operating Companies." *Entergy Servs., Inc.,* 65 F.E.R.C. ¶ 61,332, at 62,497 (1993). The Commission, *sua sponte,* raised the

broader question of whether Entergy's System Agreement permits the four incumbent subsidiaries to count their ERS units as "available" for MSS–1 purposes, and initiated a proceeding under FPA § 206, 16 U.S.C. § 824e (1994), to determine whether the Entergy companies were violating the Agreement. *See Entergy Servs.*, 65 F.E.R.C. at 62,548.

The Louisiana Public Service Commission and the Mississippi Public Service Commission, petitioners here, argued that the Entergy system had violated the MSS–1 tariff's clear definition of "available" units by including ERS units in MSS–1. They requested that Entergy Arkansas and Entergy New Orleans, the operating companies that benefitted from the inclusion of ERS units in the MSS–1 calculation, refund to the customers of Entergy Louisiana and Entergy Mississippi the amount by which their rates had been escalated by virtue of the alleged tariff violation. The Commission agreed that Entergy had violated its tariff, relying on the ALJ's finding that ERS units are neither under the control of the System Operator nor down for maintenance or nuclear refueling, but rather are effectively in storage. *See Entergy Servs., Inc.*, 80 F.E.R.C. at 61,786–87. But FERC decided that the equities of the case did not support a refund because the end result of the tariff violation was not unjust, unreasonable, or unduly discriminatory. *See id.* at 61,787–88. (The Commission expressly disclaimed any reliance on Entergy's submission that it acted in good faith in interpreting the tariff to address the novel problem

of unnecessary capacity. *See id.* at 61,788 & n. 45.) [4]

The Commission then turned to the appropriate treatment of ERS units going forward. An amendment to the System Agreement was proposed that would include an ERS unit as an available unit under MSS–1 if Entergy intends to return the unit to service at a future date, with Entergy's "intent" to be ascertained by an examination of several enumerated factors and recorded in the minutes of the Operating Committee. *See id.* at 61,788–89. Over the objections of the Louisiana and Mississippi regulators that it would be unjust to impose MSS–1 costs for units that provide no present benefit to the system and that the amendment's ambiguity made it susceptible to discriminatory application, the Commission approved the proposed amendment. *See id.* at 61,789.

Upon FERC's denial of the Louisiana and Mississippi regulators' request for rehearing on the refund and amendment issues, *see Entergy Services, Inc.*, 82 F.E.R.C. ¶ 61,098 (1998), the regulators, joined by an energy consumer (Occidental Chemical Corporation) as intervenor, brought the instant petition for review. They contend that the Commission abused its discretion by relying on superficial, even irrational, equitable factors to deny the requested refund, especially when the Commission's self-described general policy is to provide refunds to remedy overcharges.[5] And, while abandoning their complaint to the Commission that the *concept* of the amendment is unlawful insofar as it countenances the inclusion of some

---

4. The Commission also noted that because it was declining to order refunds based on its discretion, it had no need to address whether or to what extent FPA § 206(c), 16 U.S.C. § 824e(c) (1994), might preclude ordering refunds in any event. *See Entergy Servs.*, 80 F.E.R.C. at 61,788 n. 46.

5. Intervenor Occidental makes a similar argument for a full refund but, unlike petitioners, alternatively seeks a refund under *Western Resources, Inc.*, 65 F.E.R.C. ¶ 61,271, at 62,-252 (1993), in which the Commission held

that in certain circumstances involving a tariff violation that benefits ratepayers, it would deny a full refund but award a refund of the time value of the overcharged amount. But since only intervenor Occidental raises the *Western Resources* refund issue before us, we decline to address it. *See Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C.Cir.1990) ("An intervening party may join issue only on a matter that has been brought before the court by another party.").

ERS units in the MSS–1 schedule, petitioners argue that the wording of the amendment is so ambiguous and prone to discriminatory implementation that the Commission has effectively abdicated its statutory responsibilities in approving it.

## II.

We take up the refund issue first. Before addressing petitioners' various attacks on the Commission's reasoning, we think we should clarify a point on which the briefs were somewhat obscure: just what sort of injury has been caused by Entergy's violation of its tariff. No one disputes that holding everything else constant, the decision to include ERS units in MSS–1 worked to the detriment of the two companies, Entergy Louisiana and Entergy Mississippi, that had fewer ERS-eligible units than the other companies in the system. Entergy Louisiana, a short company, became more short, *i.e.*, faced higher MSS–1 payment obligations; Entergy Mississippi, consistently a long company, became less long, *i.e.*, received less in MSS–1 payments. But since the retail rates of both companies were fixed before Entergy began to include ERS units in MSS–1 and did not change until petitioners initiated rate cases in 1994, the harm cannot be found in an increase in retail rates charged to customers—as retail rates were fixed, no such increase occurred. Nor can it be asserted that the injured parties are Entergy Louisiana and Entergy Mississippi— after all, these companies, along with the other Entergy subsidiaries and the holding company, support the Commission's order. We gather the harm arises from petitioners' expectation that but for the distortions in MSS–1 payments flowing from the tariff violation, they would have brought rate cases earlier that would have lowered retail rates.

This injury might well warrant a refund to the retail customers of Entergy Louisi-

ana and Entergy Mississippi. But the Commission claimed it took a broader perspective and concluded that the equities cut against ordering a refund. Petitioners, while emphasizing the Commission's self-described "general policy . . . to order refunds to remedy overcharges," *Entergy Servs.*, 82 F.E.R.C. at 61,369 (footnote omitted), do not—and, indeed, could not— contend that the policy is without exception. *See Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816 (D.C.Cir.1998) (vacating refund order as an abuse of discretion); *Towns of Concord v. FERC*, 955 F.2d 67, 72 (D.C.Cir.1992) ("[O]ur examination of the Federal Power Act reveals no statutory command mandating refunds when the rate charged exceeds that filed.").[6] Instead, petitioners submit that the Commission's four grounds for departing from its general policy are irrational. As the Commission did not set forth these equitable factors in the alternative or otherwise suggest that its decision would be the same in the absence of one or more of the four factors, we consider each one. *See Sundor Brands, Inc. v. NLRB*, 168 F.3d 515, 518–19 (D.C.Cir.1999) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

We bear in mind, however, that "[w]hen a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing, the scope of judicial review is particularly narrow." *National Treasury Employees Union v. FLRA*, 910 F.2d 964, 966–67 (D.C.Cir.1990) (en banc); *see also ICC v. Transcon Lines*, 513 U.S. 138, 145, 115 S.Ct. 689, 130 L.Ed.2d 562 (1995); *Towns of Concord*, 955 F.2d at 76 (explaining that the words "necessary or appropriate" in FPA § 309, 16 U.S.C. § 825h, evince Congress' intent to leave refund determinations to the Commission's "expert judg-

---

6. The Commission's authority to order refunds of amounts improperly collected in violation of the filed rate derives from FPA § 309, 16 U.S.C. § 825h (1994). *See Towns of Concord*, 955 F.2d at 73.

ment"). Indeed, "the breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions ... in order to arrive at maximum effectuation of Congressional objectives." *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 159 (D.C.Cir.1967). Thus, we will set aside FERC's remedial decision only if it constitutes an abuse of discretion. *See, e.g., Public Utils. Comm'n of Calif. v. FERC,* 143 F.3d 610, 617 (D.C.Cir.1998); *Koch Gateway,* 136 F.3d at 816. To the extent the Commission made factual determinations in the course of exercising its discretion, we of course ask whether those conclusions are supported by substantial evidence. *See* 16 U.S.C. § 825*l*(b) (1994).

## A.

■ We begin with the Commission's "disincentive" rationale for denying a refund:

> [G]iven that there would have been a disincentive to participate in the ERS program without Schedule MSS–1 treatment for the units, Entergy's actions, both in creating the ERS program and in continuing to include these units in Schedule MSS–1 calculations, resulted in considerable system-wide benefits, in the form of enhanced system efficiencies and cost reductions, that ultimately benefitted ratepayers.

*Entergy Servs.,* 80 F.E.R.C. at 61,787 (footnotes omitted). In other words, the Commission thought it inequitable to order a refund when the predicate tariff violation had conferred *benefits* on the system, including the allegedly injured parties, that would not have come to pass absent the tariff violation.

Petitioners' primary argument is that FERC is simply wrong in asserting that the operating companies needed any added incentive to place units in ERS.[7] They submit that the enormous benefits expected to flow from the ERS program in terms of reduced operating, maintenance, and fuel costs, far outweigh any disincentive created by adverse MSS–1 treatment. One view of Entergy's own data supports this claim: company by company, over a roughly concurrent six-year period, the benefit of the ERS program in terms of operating and other cost savings outweighs the "cost" of adverse MSS–1 treatment for all but Entergy New Orleans. In the case of Entergy Louisiana and Entergy Mississippi, adverse MSS–1 treatment, *i.e.,* inclusion of ERS units in MSS–1, is what actually occurred. Yet Entergy Louisiana's ERS savings of $13.8 million outweigh its MSS–1 detriment of $10.6 million; Entergy Mississippi's ERS savings of $11.2 million similarly surpass its MSS–1 detriment of $8.8 million. In the case of Entergy Arkansas and Entergy New Orleans, adverse MSS–1 treatment, *i.e.,* exclusion of ERS units from MSS–1 treatment, did not occur in fact. Supposing that ERS units had been excluded from MSS–1 treatment, Entergy Arkansas would have lost $6.3 million in MSS–1 receipts but would still have enjoyed $33.9 million in ERS savings; on the other hand, Entergy New Orleans would have faced $13.1 million more in MSS–1 payments and would have enjoyed only $6.8 million in ERS savings. (This assumes that Entergy Arkansas and En-

---

7. Petitioners also argue—half-heartedly—that treating ERS units as available capability for MSS–1 purposes would neither avoid a disincentive, nor create an incentive, for the operating companies to place units in ERS. But, in a world where ERS units are excluded from treatment as available capability, an operating company will not be indifferent between receiving MSS–1 credit now (by keeping the unit in active service) and receiving MSS–1 credit later (by putting the unit in ERS and later restoring it to active service)—money now is always more valuable than money later. And petitioners overlook that treating ERS units as "available" for MSS–1 also creates an "extra" incentive in that the life of the unit is extended and the unit continues to receive MSS–1 credit (albeit at lower rates in the case of a long company) while in ERS.

tergy New Orleans would have placed the same number of units into ERS had those units been excluded from MSS–1 treatment.) All this suggests that each company except Entergy New Orleans would have made roughly the same ERS "investment" even if it had received adverse MSS–1 treatment as a result.

This analysis is inadequate, however, because it assumes that the companies make their ERS decisions with hindsight on a net basis, rather than at the margin looking forward. For each of the four pre-merger companies, if ERS units were excluded from MSS–1 treatment, there would be a cost to placing an extra unit into ERS; the company will suffer in its MSS–1 standing vis-a-vis the other companies (and they could not be sure how the other companies would behave). To be sure, there is also a benefit, in terms of ERS savings, upon placing that marginal unit into ERS. But, as the Commission and intervenor Entergy point out, the magnitude of the costs was certain whereas the scope of the benefits was not. Accordingly, we cannot say the Commission abused its discretion in rejecting an analysis that itself ignored the distinction between *ex ante* and *ex post* reasoning.

Be that as it may, petitioners argue that it makes little sense to talk of "providing incentives" or "avoiding disincentives" to the operating companies' putting units into ERS. That analytical framework is, according to petitioners, a *post hoc* construct that ignores the reality that the operating companies are wholly owned subsidiaries of Entergy Corporation and therefore have neither the ability nor the inclination to flout the System's goals. The only incen-

tives that matter, petitioners submit, are those faced by the System as a whole.

Petitioners acknowledge, as they must, however, the record testimony of several witnesses that the operating companies do in fact possess the authority to identify and recommend for final approval by the System's operating committee which—and how many—units to place in ERS. One of FERC's trial staff testified, for example, that "each operating company ... made the decision as to which unit if any to place in ERS and when to place a unit in ERS." There was further testimony that the visibility of the adverse MSS–1 treatment felt by each of the companies on a unit-by-unit basis might raise the ire of state regulators ignorant of the less visible (and more uncertain) benefits of ERS. To these witnesses, the aggravation of justifying the ERS program to state regulators might deter even the most System-loyal operating company officers from putting units into ERS. As one witness summarized, "as long as there are individual Operating Companies with responsibilities to their regulators and ratepayers, such individual Operating Company interests cannot be ignored." Surely this constitutes substantial evidence in support of the Commission's finding.[8]

Still, petitioners claim that the Commission's, and our own, prior interpretations of the nature of the Entergy system support their conception of the operating companies as indistinguishable (and unthinking) parts of a whole. However, we think that precedent is not inconsistent with the Commission's findings here. In *Middle South Energy, Inc.*, 31 F.E.R.C. ¶ 61,305 (1985), the Commission, in the course of approving the 1985 (and still current) ver-

8. Petitioners submit that other record evidence casts doubt on the Commission's finding that the operating companies approached the ERS program in a self-interested way. They point to the testimony of the operating committee's delegate that the System's final approval of units for ERS was not always documented carefully, and suggest that if the operating companies really were looking out for themselves, they would have insisted on more fastidious record-keeping. This testimony stands in contrast to the numerous other witnesses testifying that the operating companies did have some autonomy in ERS decisions, and surely cannot be said to tip the scales such that no "reasonable jury [could] reach the [Commission's] conclusion," *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 367, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

sion of the System Agreement, rejected an ALJ's finding that the operating companies exhibited a "pattern of autonomy." *Id.* at 61,645 (quoting *Middle South Energy, Inc.*, 30 F.E.R.C. ¶ 63,030, at 65,168 (1985)). The Commission found that "major critical decisions, including decisions to build new generating units, are made by the Operating Committee for the benefit of the system as a whole." *Id.* But the Commission also acknowledged that "it is clear that there is input from the individual companies and consideration of their needs in making coordinated decisions." *Id.* And, in denying petitions for review of the Commission's decision in *Middle South*, we described the Commission as finding, *inter alia*, that the "individual operating companies were intimately involved in the planning stages of new generation units and sought to promote their own interests." *Mississippi Indus. v. FERC*, 808 F.2d 1525, 1555–56 (D.C.Cir. 1987), *rev'd on other grounds*, 822 F.2d 1104 (D.C.Cir.1987). That the operating companies are involved in the "planning stages" of the ERS program—not that their decisions are final—is all the Commission found in this case.

Taking the broadest tack, petitioners also seek to undermine the Commission's very premise that the ERS program "ultimately benefitted ratepayers." Petitioners do not dispute that the ERS program provided benefits; but it is asserted that those benefits, rather than being passed on to ratepayers, stayed within the Entergy system, and thus within the pockets of Entergy's shareholders. How could it be, petitioners ask, that ratepayers enjoyed the benefits of the ERS program—which predominantly take the form of reduced operating costs that are reflected in retail rates only when a new rate case is initiated—when no such rate case occurred during the first seven years of the program? FERC responds by pointing to several ERS-related benefits that flowed to ratepayers in Louisiana and Mississippi, the service areas regulated by petitioners. For one, a 1994 rate case involving Entergy Mississippi resulted in a $28.1 million reduction in retail rates; Entergy Louisiana was in the course of a similar rate proceeding not yet completed (based on the current record) but expected to have a similar outcome. For another, even before the 1994 rate cases, the Commission identifies certain benefits that flowed to Louisiana and Mississippi ratepayers. The ERS program produced some $2.6 million in energy cost savings, $2.1 million of which was passed on to Entergy Louisiana's and Entergy Mississippi's ratepayers through the automatic fuel adjustment clauses in those companies' retail rate tariffs. And perhaps more important, as the Commission explained in its order denying rehearing, the ERS savings support an inference that, *ceteris paribus*, the companies would have less need to seek rate *increases*. See *Entergy Servs.*, 82 F.E.R.C. at 61,370.

There is ample evidence, therefore, supporting the Commission's general finding that some ERS-related benefits accrued to Louisiana and Mississippi ratepayers. Nor can we quarrel with the Commission's "expert judgment" that these benefits supported denying the requested refund, a proposition that we have endorsed in the past. See *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1100 (D.C.Cir.1993). Petitioners do not even respond to the Commission's point about the pass-through of fuel cost savings to retail ratepayers, or to the Commission's observation that the 1994 rate cases undoubtedly have captured some of the ERS-related benefits for ratepayers. And the Commission's finding that the ERS program obviated the need for Entergy Louisiana and Entergy Mississippi to seek rate increases is not, as petitioners suggest, suspect because based on an inference from the record. Those sorts of "sound inference[s] from all the circumstances," *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 379, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998), are the stuff of which substantial evidence is made.

## B.

■ Now to the Commission's second reason: "[T]he non-Gulf States ERS units were planned and constructed for the benefit of all of the pre-merger Operating Companies." *Entergy Servs.*, 80 F.E.R.C. at 61,787 (footnote omitted). In other words, the ERS units are really just another sort of excess capacity—albeit an "extended reserve"—that is available, once restored, to serve the System's needs, and therefore should receive the same cost equalization treatment under MSS–1 as does "ordinary" excess capacity. *See id.* (Placing a unit in ERS, while significantly reducing the costs associated with that unit, does not eliminate those costs entirely. *See Entergy Servs.*, 82 F.E.R.C. at 61,370 n. 9.) The Commission also pointed out that even during the units' ERS tenure, they provide System-wide benefits. *See Entergy Servs.*, 80 F.E.R.C. at 61,788. Most notably for present purposes, the companies' ability to *return* ERS units to active status allows the companies to defer the construction of costly new generation units. Moreover, the Commission's approval of an amendment to the System Agreement specifically *to address this situation* would have been forthcoming if requested (as it was in this proceeding). *See id.* Though petitioners attack this rationale—that extended reserves should be treated like ordinary reserves—insofar as it supported the Commission's decision on refunds, paradoxically they do not take issue with the identical concept underlying the amendment approved by the Commission, which expressly countenances the inclusion of ERS units in MSS–1 going forward. In challenging the amendment solely on the ground that it is too vague, petitioners have *de facto* conceded the basic equitable argument.

Even aside from petitioners' implied concession, they do not persuade us that the Commission has abused its "considerable discretion in fashioning remedies." *Public Utils. Comm'n*, 143 F.3d at 617. Petitioners contend that ERS units provide no benefits *to the System* during their ERS tenure, and hence are properly excluded from MSS–1 cost equalization because they are not presently "used and useful" to the System. But the Commission explained that ERS units are useful to the System in providing a backup reserve to the System and in allowing the companies to defer repairs of the ERS units and construction of new generating units, and we see no reason not to defer to the Commission's conception of usefulness. Nor are we impressed with petitioners' alternative point that, even though ERS units may be useful *if restored* to active service, Entergy officials have testified that some of the ERS units would be retired permanently rather than restored. The Commission reasonably concluded that all of the ERS units *could* be brought back to active service, and that this benefit was sufficient, especially when the decision to retire certain ERS units would be made in the future. (Indeed, as we noted earlier, 40% of the units placed in ERS since the inception of the program in 1986 had already been restored to active service by 1993.) FERC's judgments on these questions of benefits readily support its application of the well-settled principle that the costs associated with ERS units (whether construction expenses incurred in the past or maintenance costs incurred today) should be borne by those who benefit from them. *See, e.g., Gulf Power Co.*, 983 F.2d at 1100; *City of New Orleans v. FERC*, 875 F.2d 903, 905 (D.C.Cir.1989).

Petitioners, moreover, oversimplify in claiming that the appropriateness of MSS–1 cost equalization treatment at a given point in time hinges on whether the unit in question is "used and useful" to the System *at that time*. We explored this issue in *Town of Norwood v. FERC*, 80 F.3d 526 (D.C.Cir.1996), which involved the analogous context of a dispute over which assets a single utility could appropriately include in its rate base—analogous because an individual Entergy company's catalogue of MSS–1 eligible units is akin to a "cost-

equalization rate base." The utility in *Norwood* had shut down its nuclear power plant temporarily in response to a regulator's safety concerns, and four months later decided to retire the plant permanently because the costs of restarting it and operating it through the remainder of its license exceeded the value of the energy it could produce. *See id.* at 528. The Commission granted the utility's request to include in its rate base 100% of its $48.4 million investment in the plant that it would have recovered if it had operated the plant through the remainder of its license, and its post-shutdown operating and maintenance expenses of $68.9 million. *See id.* at 528, 530. A petition for review asserted, *inter alia,* that forcing ratepayers to pay for a plant no longer producing electricity conflicts with the principle that ratepayers should only pay for items "used and useful" in providing service. We rejected the argument:

> Although a utility's rate base normally consists only of items *presently* "used and useful," *see NEPCO Mun. Rate Comm. v. FERC,* 668 F.2d 1327, 1333 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982), a utility may include "prudent but canceled investments" in its rate base as long as the Commission reasonably balances consumers' interest in fair rates against investors' interest in "maintaining financial integrity and access to capital markets." *Jersey Cent. Power & Light Co. v. FERC,* 810 F.2d 1168, 1178 (D.C.Cir.1987) [ (en banc) ].

*Town of Norwood,* 80 F.3d at 531 (emphasis and bracketed material added). We held that the Commission had reasonably approved the requested cost recovery, in light of the nuclear plant's record of serving ratepayers for decades and the promise of savings going forward. Here, no one disputes that the ERS units have a

record of service as available capacity, or that placement of units into ERS yields savings going forward.[9] And, unlike the nuclear plant in *Norwood,* many of the ERS units will be returned to active service in the future. So even were we to assume the ERS units are not *presently* "used and useful," our broader explication of the "used and useful" principle in *Norwood* provides ample support for the Commission's reasoning.

## C.

 The final two factors relied on by the Commission are not all that weighty. FERC concluded that "there was no unjust enrichment as a result of the violation [of the tariff's definition of "available"], given that Entergy as a whole received no net gain from the inclusion of ERS units in Schedule MSS–1." *Entergy Servs.,* 80 F.E.R.C. at 61,787. The Commission explained that the only consequence of the decision to include or exclude ERS units for MSS–1 purposes is a different MSS–1 payment pattern among the operating companies; but MSS–1 payments and receipts always cancel out from the perspective of the System as a whole, and so Entergy Corporation (the holding company) had nothing to gain by violating its tariff. *See id.* at 61,787 n. 37. Petitioners appreciate this algebraic truth, but suggest that it is too superficial a characterization of the holding company's motives. Pointing to an Entergy official's testimony that one of the reasons for including ERS units in MSS–1 was to maintain stability in MSS–1 payments and receipts so as to avoid the initiation of rate cases by state regulators, petitioners contend that this strategy—which proved successful until 1994—unjustly enriched the holding company by enabling it to keep the benefits of ERS for the shareholders for longer than

---

**9.** As noted earlier, there are ongoing costs associated with the ERS units, which are akin to the post-shutdown maintenance expenses approved for recovery in *Norwood.* And petitioners themselves indicate that the ERS units

still have some initial investment costs that have not yet been recovered, *see* Brief for Petitioners at 25, the recoupment of which we also sanctioned in *Norwood.*

if ERS units had been excluded from MSS-1. The Commission responds by claiming that the benefits identified by petitioners flow *from the ERS program,* not *from the tariff violation.*

We admit that petitioners cast doubt on the strength of this factor, especially given the Commission's failure squarely to address in its brief petitioners' notion that the tariff violation provided a benefit insofar as it made rate cases less likely by not "rocking the boat" of MSS-1 payments and receipts. But under the deferential review we accord to the Commission's remedial decisions, we think the Commission's reasoning just passes muster. A reasonable response to petitioners' point, although missing in the Commission's brief, can be found in the Commission's explanation in its orders of the separate disincentive rationale we discussed at the outset of our analysis. The Commission explained that the System (and its shareholders) did not retain all of the benefits of the tariff violation that facilitated the ERS program. Even though no rate case was initiated before 1994, ratepayers were made better off insofar as the operating companies were less likely to seek *rate increases. See Entergy Servs.,* 82 F.E.R.C. at 61,370. And the 1994 rate cases appear to have captured benefits for ratepayers in the form of reduced retail rates. The Commission's view that this division of benefits between the Entergy System and the retail ratepayers was not "unjust" deserves deference. Indeed, it is hardly unusual for a utility whose rates are set by cost-of-service ratemaking principles to seek to reduce its costs, thereby increasing profits, during the interim between rate-setting proceedings. *See National Rural Telecom Ass'n v. FCC,* 988 F.2d 174, 178 (D.C.Cir.1993); STEPHEN BREYER, REGULATION AND ITS REFORM 48 (1982).

■ The Commission's final factor sounds in estoppel; the Commission stated that "nearly every participant in this proceeding, including [petitioners], at one time either believed that the System Agreement permitted the inclusion of ERS units in Schedule MSS-1 calculations, or at least did not protest such treatment." *Entergy Servs.,* 80 F.E.R.C. at 61,787–88 (footnote omitted). Petitioners concede that they did not object until the Commission initiated its § 206 investigation into the possible tariff violation, but argue that the timing of their protest is irrelevant. They explain that in the merger review proceeding, their entire focus was on the treatment of Gulf States' ERS units, and thus they should not be faulted for missing the possibility that inclusion of ERS units in MSS-1 by the incumbent subsidiaries was working to the detriment of Entergy Louisiana and Entergy Mississippi. Only when they concentrated on the § 206 proceeding, petitioners tell us, did they discover the disparity among the incumbent subsidiaries in ERS-eligible units and recognize the impact on Entergy Louisiana and Entergy Mississippi of including ERS units in MSS-1. Petitioners also urge that even if they should have complained earlier, that failing should not be attributed to the retail ratepayers, the ultimate beneficiaries of the hoped-for refund.

Again, though this factor is less weighty than the others—particularly the first two—and perhaps would be inadequate standing alone, we do not regard it as objectionable.

### III.

■ There remains petitioners' challenge to the amendment approved by the Commission to govern the MSS-1 treatment of ERS units going forward. The amendment provides:

A unit is considered available to the extent the capability can be demonstrated and (1) is under the control of the System Operator, or (2) is down for maintenance or nuclear refueling, *or (3) is in extended reserve shutdown (ERS) with the intent of returning the unit to service at a future date in order to meet*

*Entergy System requirements. The Operating Committee's decision to consider an ERS unit to be available to meet future System requirements shall be evidenced in the minutes of the Operating Committee and shall be based on considerations of current and future resource needs, the projected length of time the unit would be in ERS status, the projected cost of maintaining such unit, and the projected cost of returning the unit to service.*

*Entergy Servs.*, 80 F.E.R.C. at 61,788–89 (emphasis in original). Petitioners contend that this amendment grants unfettered discretion to Entergy, and thus is an effective abdication of the Commission's statutory responsibility to ensure that rates are just and reasonable. *See* 16 U.S.C. § 824d(a). They explain that the amendment does not indicate in which direction the various factors point, and does not say anything about the relative weights of the factors. Petitioners bolster their claim by directing us to the testimony of an Entergy witness who opined that the factors could cut for or against MSS–1 inclusion depending on the circumstances.

While the amendment is certainly closer to a standard than to a rule, we defer to the Commission's judgment that it is just and reasonable. *See Northern States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C.Cir.1994) ("Because '[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission,' our review of whether a particular rate design is 'just and reasonable' is highly deferential." (quoting *Town of Norwood v. FERC*, 962 F.2d 20, 22 (D.C.Cir.1992)) (alteration in original)). FERC understandably concluded that the amendment set out the parameters of the operating committee's discretion, and that discriminatory implementation of the amendment could be remedied in a proceeding under FPA § 206, 16 U.S.C. § 824e, a review facilitated by the requirement that the operating committee

record the reasons for its decisions in writing. The amendment, moreover, is a far cry from the vacuous tariff provisions that the Commission has rejected in the past. *See, e.g., Southern Natural Gas Co.*, 47 F.E.R.C. ¶ 61,205, at 61,708 (1989) (rejecting portion of proposed tariff that granted oil pipeline authority to construct facilities to serve shippers "in its sole discretion"); *Tennessee Gas Pipeline Co.*, 45 F.E.R.C.¶ 61,236, at 61,693 (1988) (same); *cf. Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486 (D.C.Cir.1984) (vacating Commission order setting permissible oil pipeline rates so high that "regulation" would be left to market forces, reasoning that the Commission thereby contravened its statutory responsibility to ensure that rates are just and reasonable).

\*　　\*　　\*

For the foregoing reasons, the petition for review is denied.

*So ordered.*