**CONNECTICUT VALLEY ELECTRIC COMPANY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Granite State Hydropower Association, et al., Intervenors.**

No. 98–1294.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1999.

Decided April 14, 2000.

James H. McGrew argued the cause and filed the briefs for petitioner.

Beth G. Pacella, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.

Earle H. O'Donnell, Donna M. Attanasio, Laurel W. Glassman, Margaret A. Moore, and Howard E. Shapiro were on the brief for intervenors Westmoreland–LG & E Partners and Wheelabrator Claremont Company, L.P. Allan W. Anderson, Jr., and David B. Ward entered appearances for intervenor Granite State Hydropower Association.

Before: GINSBURG, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Connecticut Valley Electric Company, a local distribution company serving some 10,000 customers in New Hampshire and Vermont, petitions for review of two orders of the Federal Energy Regulatory Commission denying Connecticut Valley any relief against a power producing facility that violated § 3(17)(C)(ii) of the Federal Power Act (FPA). Connecticut Valley claims the Commission's orders violate § 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), and that the Commission is required by § 3(17)(C)(ii) of the FPA to revoke the facility's status as a "Qualifying Facility" (QF), or alternatively that the Commission's refusal to revoke the facility's QF status or to provide any other relief is an abuse of the agency's remedial discretion.

We hold that we are without jurisdiction to address Connecticut Valley's claim arising under § 210 of the PURPA. We reject Connecticut Valley's claim that § 3(17)(C)(ii) of the FPA requires the Commission to revoke the facility's QF status, and we conclude that the Commission's decision to deny any relief was a valid exercise of its remedial discretion. We therefore deny the petition for review.

## I. Background

The Congress enacted Title II of the PURPA, Pub.L. No. 95–617, 92 Stat. 3117, 3134 (1978), in an effort to encourage the development of cogeneration and small power production facilities. A "cogeneration facility" produces both electric energy and steam or some other form of usable energy, 16 U.S.C. § 796(18)(A); a "small power production facility" produces less than 80 megawatts of electricity using biomass, waste, renewable resources, or geothermal resources as the primary energy source, *id.* § 796(17)(A). The Supreme Court described § 210 of the PURPA in *FERC v. Mississippi,* 456 U.S. 742, 750–51, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (citations omitted):

... [Congress] felt that two problems impeded the development of nontradi-

tional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.

In order to overcome the first of these perceived problems, § 210(a) directs FERC ... to promulgate ... rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities....

To solve the second problem perceived by Congress, § 210(e), 16 U.S.C. § 824a–3(e), directs FERC to prescribe rules exempting the favored cogeneration and small power facilities from certain state and federal laws governing electricity utilities.

In order to secure these benefits to qualifying cogeneration and small power production facilities—so-called Qualifying Facilities, or QFs—the Commission has promulgated the following regulations, respectively: 18 C.F.R. §§ 292.303–305, which require an electric utility to sell to a QF electricity for use in its operations at regulated tariff rates and to buy the QF's output at the utility's "avoided cost"; * and 18 C.F.R. §§ 292.601–602, which exempt a QF from the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq., most state regulation

as a public utility, and much of the FPA. A small power producer (SPP) is a QF only if it (1) meets various Commission requirements respecting fuel use, fuel efficiency, and reliability, 16 U.S.C. § 796(17)(C)(i) and (2) "is ... not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)," id. § 796(17)(C)(ii).

## A. Regulatory Background: Gross Versus Net Output

There are two ways of measuring the power production capacity of a QF: one looks to gross output, which is all electricity produced by the facility, the other to net output, which is gross output less the electricity used in the QF's own operations. The distinction is important because many QFs purchase their internal operating needs at tariffed rates from the electric utility to which they sell their output, which the utility is required to buy at the utility's full avoided cost. If the QF were allowed to sell its gross output to the electric utility at full avoided cost, then it would in effect be selling back at a significant markup the quantum of electricity it purchased from the utility for its internal operating needs.

In 1991, the Commission for the first time addressed whether a facility that sold its gross output would lose its status as a QF because it would no longer be, as required by § 3(17)(C)(ii),* "not primarily

---

* PURPA § 210(b), 16 U.S.C. § 824a–3(b), caps the total amount a utility may be required to pay for purchases from a QF at "incremental cost," also called "full avoided cost," *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 404, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983), which is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source," § 210(d), 16 U.S.C. § 824a–3(d). In promulgating regulations to implement § 210, the Commission adopted this statutory cap as the amount a utility would be required to pay for all purchases from a QF. *See* 18 C.F.R. § 292.304(b)(2). In other

words, the Commission set the rate at the maximum level. The Supreme Court approved in *American Paper*, 461 U.S. at 417, 103 S.Ct. 1921.

Calculation of the full avoided cost rate is complicated. *See* 18 C.F.R. § 292.304(e). For purposes of this petition the important point is that the rate that a QF can require a utility to pay is almost always higher than the regulated tariff rate at which the QF can purchase from the utility electricity for its internal operating needs.

* *Turners Falls* actually addressed a cogenerator's status as a QF pursuant to § 3(18)(B)(ii). Section 3(17)(C)(ii), which applies to SPPs, and § 3(18)(B)(ii), which applies to cogenera-

engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)." *Turners Falls Ltd. Partnership*, 55 FERC ¶ 61,487, 1991 WL 501859. The Commission began by recognizing that § 3(17)(C)(ii) is ambiguous: If a utility provides a QF with power for its operations through one line, and the QF provides its gross output back to the utility through a separate line, then in one sense (namely, the physical) the QF is selling only electricity "solely from cogeneration or small power production facilities" and the requirement of § 3(17)(C)(ii) is satisfied; in another (namely, the economic) sense, however, the QF is selling back to the utility electricity that was generated by the utility, in violation of that section. *See id.* at 62,668.

In light of this ambiguity and the broad discretion the Congress granted the Commission in § 3 of the FPA to determine the requirements for QF certification, the Commission concluded that it could lawfully interpret the statute either to allow or to preclude a QF's sale of its gross output. *See id.* at 62,669. In the end, however, the Commission decided that the policies of the PURPA are served better if the statute is read to say that a facility that sells its gross output is not a QF. *See id.* at 62,671.

### B. Procedural Background: Petition to Revoke Claremont's QF Status

Wheelabrator Claremont Company (hereinafter Claremont) operates an SPP facility in Claremont, NH. In 1983 the New Hampshire Public Utilities Commission approved a settlement agreement among Connecticut Valley, Claremont (through its predecessor in interest), and the NHPUC's own staff. *See In re New Hampshire/Vermont Solid Waste Project*, DR 82–343, Order No. 16,232, 68 NHPUC 96. The settlement, as embodied in a contract executed between Connecticut Valley and Claremont and approved by the

NHPUC in 1984, provided that Connecticut Valley would purchase the "entire electrical output" of Claremont's proposed SPP facility for 20 years at Connecticut Valley's full avoided cost (of nine cents per kWh, adjusted for inflation) while simultaneously providing Claremont with its needs for electricity in its operations, at Connecticut Valley's consolidated tariff rate, which has proven to be less than the adjusted contract rate. Claremont applied to the Commission for QF certification, representing that its output would be 4.5 MW but it did not specify whether that was its gross or net output. The Commission certified the Claremont facility as a QF in 1986, and in 1987 Claremont began selling to Connecticut Valley its gross electrical output of 4.5 MW.

In 1993 Claremont, in response to an inquiry from the NHPUC, reported that its gross output was 4.5 and its net output 3.9 MW. Connecticut Valley then asked the NHPUC to investigate whether Claremont qualified as a QF in view of its having sold its gross output. Instead, the NHPUC, noting that the FERC has exclusive jurisdiction over the decertification of a QF, ordered Connecticut Valley to petition the Commission for revocation of Claremont's QF status. *See In re Connecticut Valley*, DR 93–196, Order No. 21,000 (NHPUC Oct. 18, 1993).

Connecticut Valley duly filed a complaint with the Commission seeking revocation of Claremont's QF status based upon Claremont's sales of gross output and its alleged misrepresentations to the Commission in applying for QF status. Connecticut Valley further requested that, once Claremont's QF status was revoked, the Commission take jurisdiction over Connecticut Valley's contract with Claremont pursuant to §§ 205–206 of the FPA and either rescind the contract and retroactively determine just and reasonable rates for past sales, or at least prospective-

---

tors, are identical; the parties agree that the Commission's interpretation of § 3(18)(B)(ii) in *Turners Falls* applies to both provisions.

For the sake of consistency, therefore, we refer to § 3(17)(C)(ii) throughout this opinion.

ly reform the contract so that Connecticut Valley need purchase only Claremont's net output.

Although the Commission agreed with Connecticut Valley that Claremont could not be a QF because its gross sales took it outside the rule of § 3(17)(C)(ii), the Commission denied Connecticut Valley any relief. *See Connecticut Valley Elec. Co. v. Wheelabrator Claremont Co.*, 82 FERC ¶ 61,116, at 61,422 (1998). The Commission explained that the statute is ambiguous and could be read to allow gross sales by a QF. Not until *Turners Falls*, the Commission concluded, had it made clear that gross sales would violate § 3(17)(C)(ii) and thus preclude QF status. *See id.* at 61,418. Noting, however, that many QFs had in good faith entered into long-term contracts for the sale of their gross output, and not wanting to upset their settled expectations, the Commission adopted a remedial policy that was only partially retroactive: "We will . . . revoke the QF status of any facility which sells in excess of its net output pursuant to a contract entered into after the date of issuance of *Turners Falls.*" *Id.* at 61,420. Because the Claremont contract predated *Turners Falls*, the Commission declined to revoke Claremont's QF status or to take any other remedial action. *See id.* at 61,422.

Connecticut Valley petitioned for rehearing, arguing that § 3(17)(C)(ii) is not ambiguous and therefore the Commission should have decertified Claremont or provided Connecticut Valley some alternative relief for Claremont's acknowledged violation of the statute. The Commission denied rehearing, 83 FERC ¶ 61,136 (1998), and Connecticut Valley petitioned this court for review of both Commission orders.

## II. Analysis

Connecticut Valley and the Commission agree that under § 3(17)(C)(ii) of the FPA an SPP that sells more than its net output, as Claremont does, cannot be a QF. The Commission maintains that it may nonetheless refuse to revoke Claremont's QF status and may deny Connecticut Valley

any alternative relief. Connecticut Valley claims that the Commission's refusal to revoke Claremont's QF status or to provide some alternative relief violates § 210 of the PURPA and § 3(17)(C)(ii) of the FPA, and is an abuse of the Commission's remedial discretion.

### A. Section 210 of the PURPA

Connecticut Valley claims that under the challenged orders it is required to pay Claremont more for electricity than the lawful maximum established by § 210 of the PURPA, that is, its full avoided cost. The matter is less than straightforward because § 210 actually caps the total amount (not just the per unit rate) a utility is required to pay a QF for electricity: the utility can be required to pay no more than "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d). Connecticut Valley claims its contract with Claremont requires it to purchase Claremont's gross output, whereas but for the purchase from Claremont, Connecticut Valley would need to generate or purchase electricity equal only to Claremont's net output. Thus the Commission's refusal to revoke Claremont's QF status and reform the contract requires Connecticut Valley to pay more than its full avoided cost.

■ Although neither party raised this issue in their briefs, we asked the parties to address at oral argument whether we have jurisdiction to adjudicate in the first instance a dispute arising under § 210. *See New York State Electric & Gas Corp. v. FERC*, 117 F.3d 1473, 1477 (D.C.Cir. 1997); *Niagara Mohawk Power Corp. v. FERC*, 117 F.3d 1485, 1489 (D.C.Cir.1997). The Commission takes the position that we do not. Connecticut Valley replies with a variety of arguments, none of which is responsive to the Commission's jurisdictional argument.

We agree with the Commission that *New York State Electric* and *Niagara Mohawk* control this case. Section 210 sets up an elaborate enforcement scheme in which the roles of the Commission, the state public utility commissions (PUCs), and the federal courts are specifically delineated. Under § 210(a), the Commission is required to promulgate regulations governing utilities' purchases of electricity from QFs, including regulations implementing the statutory cap under §§ 210(b)-(d). 16 U.S.C. §§ 824a–3(a), (b), (d). The state PUCs are then required (by § 210(f), 16 U.S.C. § 824a–3(f)) to implement the Commission's regulations. If a PUC fails to implement the regulations, the Commission may bring an enforcement action against that PUC in federal district court. Alternatively, if a private party petitions the Commission to initiate an enforcement action against a PUC and the Commission declines, then that party may itself sue the PUC in federal district court to force implementation of the regulations. *See* § 210(h)(2), 16 U.S.C. § 824a–3(h)(2); *see also New York State Electric*, 117 F.3d at 1476.

Thus, when Connecticut Valley says that § 210 "requires FERC to cap QF rates at full avoided cost," it is correct only in the limited sense that the Commission is required to promulgate regulations to that effect. The Commission satisfied that obligation when it promulgated 18 C.F.R. § 292.304(a)(2), which limits the cost at which a utility purchases power from an SPP at an amount equal to the utility's full avoided cost. The Commission's only obligations under § 210 are the promulgation and periodic revision of these regulations and of the exemption regulations required by § 210(e); therefore, the Commission's decision not to take any action in response to Claremont's apparent violation of § 3(17)(C)(ii) cannot be a violation of § 210 by the Commission. The Commission has in effect merely "announced the position ... it would take in any future enforcement action that [Connecticut Valley] might bring," *New York State Electric*, 117 F.3d at 1476, namely, that it will not seek to remedy violations of § 210 arising from Claremont's sale of gross output under a contract entered into prior to the Commission's decision in *Turners Falls*.

Connecticut Valley may have a valid claim that the NHPUC has violated § 210 by approving a contract that requires Connecticut Valley · to purchase gross output and therefore to pay more than the utility's full avoided cost. As we have said before, "[t]he failure of a state commission to ensure that a rate does not exceed a utility's avoided cost is a failure to comply with a [Commission] regulation implementing the PURPA," which "would ordinarily be challenged through an enforcement action brought in district court under § 210(h)." *Id.* Based upon the Commission's position as stated in the orders under review, that agency would presumably decline to bring an enforcement action if Connecticut Valley petitioned it to do so; and its declination would clear the way for Connecticut Valley to bring its own enforcement action in district court.

If this court, in the guise of reviewing the Commission's present no-action position, were to address the question whether the petitioner's contract with Claremont violates § 210, then we would "usurp the role of the district court as the court of first instance, contrary to the enforcement scheme adopted by the Congress in § 210(h) of the PURPA." *Industrial Cogenerators v. FERC*, 47 F.3d 1231, 1235 (D.C.Cir.1995). Therefore, we conclude we are without jurisdiction to address Connecticut Valley's claim arising under § 210. *See id.* at 1236; *New York State Electric*, 117 F.3d at 1477; *Niagara Mohawk*, 117 F.3d at 1489.

## B. Section 3(17)(C)(ii) of the FPA

Connecticut Valley next challenges the Commission's decision to grandfather contracts entered into prior to its decision in *Turners Falls* and therefore not to revoke Claremont's QF status. Connecticut Valley claims that in view of the clear congressional decision in FPA § 3(17)(C)(ii)

that an SPP selling more than its net output is not within the definition of a QF, "the Commission lack[s] the discretion to grandfather any QF contracts requiring utilities to purchase a QF's gross output."

■ In order to establish that the Commission has no remedial discretion, Connecticut Valley must demonstrate not only that Claremont's sale of gross output violates § 3(17)(C)(ii), but also that the Commission is required to apply the revocation rule of *Turners Falls* to contracts predating that decision. The first point is moot, for the Commission agrees that Claremont is in violation of the statute. The second point is the difficult one for Connecticut Valley because "the breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions." *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C.Cir.1967); *Louisiana Public Service Comm'n v. FERC*, 174 F.3d 218, 225 (D.C.Cir.1999). In other words, the Commission ordinarily has remedial discretion, even in the face of an undoubted statutory violation, unless the statute itself mandates a particular remedy. *See, e.g., Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 72–73, 76 n. 8 (D.C.Cir.1992).

■ Section 3(17)(C)(ii) does not expressly specify a particular remedy for the violation of its terms. *Compare National Insulation Transp. Comm. v. ICC*, 683 F.2d 533, 537–38 (D.C.Cir.1982) (ICC would lack remedial discretion for certain rate violations because 49 U.S.C. § 10707(d)(1) (1982) expressly mandates refund). Connecticut Valley argues, nonetheless, that § 3(17)(C)(ii) unambiguously defines the requirements for status as a QF, and the Commission must carry out this clear congressional command by denying QF status to any facility that does not fit the bill.

We reject this claim because, contrary to the petitioner's premise, § 3(17)(C)(ii) is not unambiguous. As the Commission first recognized in *Turners Falls*, when electricity sales between a QF and a utility are analyzed from a physical perspective, § 3(17)(C)(ii) can reasonably be interpreted to allow a QF to sell its gross output. *See Turners Falls*, 55 FERC at 62,668. Based upon this ambiguity, the Commission, as the agency charged with administering the FPA, determined that it had discretion to interpret the statute as allowing or precluding the sale of gross output by a QF; it then determined that the interpretation more in keeping with the purpose of the Act prohibits such sales. Both interpretations of § 3(17)(C)(ii) are self-evidently reasonable in the face of this ambiguity, and Connecticut Valley raises no legal principle that would require the Commission—despite the severe impact upon both the settled expectations of private parties and the governmental interest in encouraging the development of nontraditional generating facilities—to apply retroactively the interpretation of § 3(17)(C)(ii) it ultimately adopted in *Turners Falls*. *Cf. Clark–Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C.Cir.1987) (*en banc*) (private and governmental interests may overcome "general principle [that agency] may apply ... new interpretation" retroactively). In light of the ambiguity of § 3(17)(C)(ii) and the absence of a specific remedial command from the Congress, we conclude that the Commission retains remedial discretion to decide whether to revoke Claremont's status as a QF.

## C. Abuse of Remedial Discretion

■ Because we conclude that the Commission has discretion with respect to remedying Claremont's violation of § 3(17)(C)(ii), Connecticut Valley is remitted to challenging the Commission's exercise of that discretion, which we review only for abuse. *See Louisiana Public Serv. Comm'n v. FERC*, 174 F.3d 218, 225 (D.C.Cir.1999). An agency abuses its remedial discretion if its decision "conflicts with the 'core purpose[]'" of the statute it

administers, *Towns of Concord*, 955 F.2d at 74 (quoting *Maislin Indus., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 133, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)), or if it is not "otherwise reasonable," that is, based upon a reasonable accommodation of all the relevant considerations and not inequitable under the circumstances. *Towns of Concord*, 955 F.2d at 75–76; *see also Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810 (D.C.Cir.1998); *Laclede Gas Co. v. FERC*, 997 F.2d 936 (D.C.Cir.1993). Insofar as the Commission's remedial decision is based upon factual determinations, they must be supported by substantial evidence in the record. *See* 16 U.S.C. § 825*l*(b); *Louisiana Public Serv. Comm'n*, 174 F.3d at 225.

■ Connecticut Valley argues that the Commission's decision not to revoke Claremont's QF status or to provide any alternative relief is an abuse of discretion for a number of reasons. First, Connecticut Valley claims the decision directly conflicts with all three statutory purposes expressed in § 101 of the PURPA, to wit, "conservation of energy," "optimization of [electric utility] efficiency," and "equitable rates to electric consumers." 16 U.S.C. § 2611.

■ As the Commission properly notes, however, § 101 applies only to Title I of the PURPA, whereas QF status is a creature of Title II. And the Supreme Court has said that the core purpose of Title II is "to encourage the development of cogeneration and small power production facilities" by addressing "problems imped[ing] the development of nontraditional generating facilities." *FERC v. Mississippi*, 456 U.S. at 750, 102 S.Ct. 2126. In other words, Title II reflects, predominantly, solicitude for certain types of producers rather than for the consumers who must pay their rates. Accordingly, the Commission deemed it material in the orders under review that "many QFs ... have entered into contracts which require[ ] or permit[ ] the ... sale of gross output." 82 FERC at 61,419. Revoking the QF status of those facilities, or altering

their "obligations and responsibilities under[ ] such executed PURPA sales contracts," *id.* at 61,420, would undercut the purpose of the Congress in Title II to encourage the development of these nontraditional generating facilities. We see no conflict, therefore, between the Commission's exercise of remedial discretion and the relevant statutory purpose.

Nor can we accept Connecticut Valley's second argument, which is that the Commission's failure even to consider harm to consumers was an abuse of discretion. According to Connecticut Valley, § 210(b) of the PURPA expressly requires the Commission to balance the interests of consumers against those of producers, thus:

> The rules prescribed under subsection (a) of this section shall insure that, in requiring any electric utility to offer to purchase electric energy from any [QF], the rates for such purchase ... shall be just and reasonable to the electric consumers of the electric utility and in the public interest....

16 U.S.C. § 824a–3(b). This requirement is directed, however, at the Commission's exercise of rulemaking authority over the rates utilities must pay QFs for power. The Supreme Court has already held that the full avoided cost rule satisfies the requirements of § 210(b). *See American Paper Inst.*, 461 U.S. at 415–17, 103 S.Ct. 1921. Therefore the Commission did not abuse its discretion when it omitted explicitly to consider anew the interests of consumers.

Third, Connecticut Valley claims the Commission failed adequately to consider whether *Occidental Geothermal, Inc.*, 17 FERC ¶ 61,231 (1981), and *Power Developers, Inc.*, 32 FERC ¶ 61,101 (1985), put Claremont on notice, before the contract was executed (or at least before Claremont filed its application for certification as a QF), that a QF may not sell its gross output. The Commission did not fail fully to consider those cases. On the contrary, the Commission expressly read both cases

as having resolved issues related to but not the same as that resolved in *Turners Falls*: In *Occidental Geothermal* the Commission held that net output is the appropriate measure of the 80–MW limitation upon SPPs; and in *Power Developers* it concluded that "a QF may not sell more than net output at avoided cost rates." *Connecticut Valley*, 82 FERC at 61,417–18. Although both cases were, of course, relevant to the Commission's understanding of this case, the Commission reasonably concluded that it was not until *Turners Falls* that it "removed any remaining ambiguity about whether the 'simultaneous buy-sell' rule permitted a sale in excess of net output [and] clearly stated that a sale in excess of net output would deprive a facility of its QF status." *Id.* at 61,417; *see also* 83 FERC ¶ 61,136, at 61,610. There was no abuse of discretion here.

Fourth, Connecticut Valley argues the Commission failed to consider whether Claremont intentionally or negligently misled the Commission by stating its gross rather than its net output in its application for certification. The Commission did not have to address this claim in the orders under review, however; it was rendered moot when the Commission held that it was reasonable for a facility applying for QF certification prior to the *Turners Falls* decision to have believed that the Commission's "simultaneous buy-sell" rule allowed the QF to sell its gross output. *See* 82 FERC at 61,418. The Commission noted that many applicants—and indeed several state PUCs—had thought gross sales were permitted under the Commission's regulations, and that although this point had been "clarified to a significant degree in 1985 in *Power Developers*," it was not until *Turners Falls* in 1991 that the Commission "removed any remaining ambiguity." *Id.* The Commission could hardly say, therefore, that prior to that decision a QF was either intentionally deceptive or even merely negligent if it listed its gross rather than its net output in applying for QF certification.

Finally, Connecticut Valley claims the Commission failed to support with substantial evidence a key factual determination, namely, that Claremont had a settled expectation it could lawfully sell its gross output when it entered into the contract. As Connecticut Valley conceives the issue, the Commission must show that, in developing and financing the SPP facility, Claremont actually relied upon being able to sell its gross output.

■ The Commission never made a factual finding about Claremont's actual reliance, however. Rather, the Commission reiterated its general policy "against invalidating contracts for which a PURPA-based challenge was not timely raised—that is, before the contracts were executed," so as not "to upset the settled expectations of parties to, and to invalidate any of their obligations and responsibilities under, such executed PURPA sales contracts." *Id.* at 61,419–20; *see also* 83 FERC ¶ 61,136, at 61,611. The Commission reasonably infers the parties' settled expectations from the terms of their executed contract; either party may avoid such an inference by including a specific reservation in its contract or by challenging the validity of a contract provision at the time it executes the contract.

Because the Commission did not make a factual finding relative to settled expectations, but rather drew a reasonable inference in accord with its established policy, it need not support this aspect of its decision with substantial evidence. Nor does Connecticut Valley claim that the Commission is legally required to determine settled expectations by making a case-specific factual inquiry rather than relying upon a rule of general applicability. The only question remaining, therefore, is whether the Commission's application of its general rule in this case was arbitrary and capricious. *See Southeastern Michigan Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C.Cir. 1998). Connecticut Valley included no reservation clause in the contract suggesting disagreement about or uncertainty over the purchase and sale of Claremont's gross output; nor was Connecticut Valley chal-

lenging gross sales in court or before the Commission at the time it entered into the contract. We therefore conclude that the Commission's application in this case of its general rule inferring the settled expectations of the parties to a contract from the terms of their agreement was not arbitrary or capricious.

### III. Summary and Conclusion

We are without jurisdiction to review Connecticut Valley's claim that the orders under review violate § 210 of the PURPA. As to Connecticut Valley's other challenges, we conclude that the Commission acted within its remedial discretion in refusing to revoke Claremont's QF status or to provide any other relief to Connecticut Valley. Therefore, the petition for review is

*Denied.*