**BELLSOUTH TELECOMMUNICATIONS, INC.,** Plaintiff,

v.

**PUBLIC SERVICE COMMISSION OF KENTUCKY, et al., Defendants.**

**No. CIV.A. 01–70–JMH.**

United States District Court, E.D. Kentucky.

April 26, 2004.

Creighton E. Mershon, Sr., BellSouth Telecommunications,Inc., Louisville, KY, Mark R. Overstreet, Stites & Harbison, PLLC—Frankfort, Frankfort, KY, R. Douglas Lackey, BellSouth Telecommunications, Atlanta, GA, for Bellsouth Telecommunications, Inc., Plaintiff.

Amy E. Dougherty, Kentucky Public Service Commission, Frankfort, KY, Deborah Tully Eversole, Stoll, Keenon & Park, LLP—Louisville, KY, Edward F. Busch, Conliffe, Sandmann & Sullivan, Jack R. Underwood, Conliffe, Sandmann & Sullivan, Louisville, KY, Loretta A. Cecil, Womble Carlyle Sandridge & Rice PLLC, Atlanta, GA, Richard M. Sullivan, Conliffe, Sandmann & Sullivan, Louisville, KY, for Martin J. Huelsman in his official capacity as Commissioner of the Public Service Commission of Kentucky, Gary W. Gillis in his official capacity as Vice–Chairman of the Public Service Commission of Kentucky, Robert E. Spurlin in his official capacity as a Commissioner of the Public Service Commission of Kentucky, AT & T Communications of the South Central States, Inc., Public Service Commission of Kentucky, TCG Ohio a New York General Partnership, Defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

By its complaint, Plaintiff BellSouth Telecommunications, Inc. (hereinafter, "BellSouth"), has requested that this

Court review the May 16 and June 22, 2001, orders of the Public Service Commission of Kentucky (hereinafter, "PSC") in an arbitration between BellSouth and AT & T Communications of the South Central States, Inc. (hereinafter, "AT & T"). BellSouth has filed a brief in support of its position [Record No. 22]. Defendants Martin J. Huelsman, Gary W. Gillis, Robert E. Spurlin, and the PSC (hereinafter, collectively, "PSC") and AT & T have also filed briefs [Record Nos. 24 & 25] to which BellSouth has replied [Record No. 26]. Oral arguments were heard by this Court on January 27, 2003. Subsequently, the parties submitted correspondence to the Court discussing the impact of an anticipated FCC order on this matter, and that correspondence was filed in the record [Record Nos. 40–44, & 46]. Upon the request of the PSC, a supplemental briefing schedule was set in this matter. BellSouth filed a supplemental brief [Record No. 48]. Responsive supplemental briefs were filed by the PSC and AT & T [Record Nos. 49 & 50], and a reply was made by BellSouth [Record No. 51]. This matter is now ripe for decision.

## I. BACKGROUND

The present action arises out of an arbitration before the Commission between BellSouth and AT & T concerning an interconnection agreement between the parties. *See In the Matter of Petition of AT & T Communications of the South Cen-* *tral States, Inc. and TCG Ohio for arbitration of certain terms and conditions of a proposed agreement with Bellsouth Telecommunications, Inc. pursuant to 47 U.S.C. Section 252,* Case No.2000–00465, 2002 WL 1807796. Of the issues presented in that arbitration, only one is the subject of this action. Specifically, whether under the circumstances presented, AT & T may avoid the liability under a contract to purchase special access services from BellSouth at a discount contingent upon meeting certain revenue and term requirements, when, as a result of its subsequent decision to convert to unbundled network elements (hereinafter, "UNEs") or combinations of UNEs, it is unable to meet the revenue requirements of that contract.

At all relevant times in this matter, AT & T has been a competing local exchange carrier (hereinafter, "CLEC"), and BellSouth has been the incumbent local exchange carrier (hereinafter, "ILEC"). In June 1999, AT & T entered into a 58 month volume and term contract with BellSouth under BellSouth's FCC-approved tariff to purchase "special access services."[1] In selecting the volume and term contract, AT & T rejected the alternative offered by BellSouth, purchasing special access services on a monthly basis.[2]

At the time of the parties entered into June 1999 volume and term contract, AT & T and BellSouth disputed BellSouth's obligation to provide combined UNEs in lieu of special access service.[3] BellSouth re-

---

1. These services are sometimes referred to as "transport and loops" and consist of "entrance facilities from the interexchange carrier's [AT & T] point of presence (POP) to [BellSouth's] switch or serving wire center (SWC), a dedicated transport link from the SWC to an end office, and a channel termination facility from the end office to the end user." *Third Report and Order, In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* CC Docket No. 96–98, FCC 99–238 at 220–21, 1999 WL 1008985 (November 5, 1999) (here-

inafter, *"Third Report and Order"*). Of note, BellSouth also offered AT & T the option of creating the equivalent of special access services by purchasing and assembling or combining the unbundled network elements itself.

2. The volume and term contract is identical to the monthly contract except that in return for a lower unit rate the CLEC agrees to a specific monthly revenue commitment for a fixed period.

3. BellSouth now offers combined UNEs.

fused to offer the option of combined UNEs, claiming that it was not legally obligated to do so. Absent a lower priced option, AT & T agreed to the volume and term contract. The contract also contains a provision imposing liability charges if the minimum volume requirements are not met, or if the contract is terminated prior to the end of its term.

During the negotiation of a subsequent interconnection agreement in 2000, AT & T sought a provision that would absolve it of liability under the 1999 volume and term contract if it converted the special access services to unbundled network elements. AT & T was concerned because it risked not meeting the minimum revenue requirements under the volume and term contract for special access services contract and triggering a liability charge if it converted a large enough portion of the special access lines to combined UNEs. BellSouth declined to absolve AT & T of any potential liability under the volume and term contract, and AT & T arbitrated the issue before the Kentucky Public Service Commission (hereinafter, "PSC") pursuant to 47 U.S.C. § 252.

The PSC concluded that, despite the language of BellSouth's FCC tariff, Bell-South could not enforce the early termination or revenue liability provisions of the volume and term contract. The PSC found that the penalty would be inappropriately charged to AT & T because (1) the conversion of special access services to combinations of unbundled network elements, on the facts presented, did not constitute a "termination" under the agreement and (2) AT & T entered into the volume and term contract only because BellSouth refused to offer the combined UNEs as required by relevant statutes and rules. This issue is now before this Court on appeal.

## II. STANDARD OF REVIEW

This Court reviews *de novo* whether the interconnection agreement resulting from the PSC's order meets the requirements of §§ 251 and 252 of the Act, limiting its review to those "issues and responses" resolved by the Kentucky PSC as a state commission may arbitrate only those "issues and responses" raised by the parties in the arbitration. 47 U.S.C. § 252(b)(4) and (e)(6); *GTE North,* 209 F.3d at 916; *Michigan Bell Tel. Co. v. Strand,* 305 F.3d 580, 586 (6th Cir.2002). The Court will consider the FCC's interpretation of the Act to be persuasive authority. *Michigan Bell Tel. Co.,* 305 F.3d at 586.

The PSC's findings of fact made in the course of exercising its enforcement authority will be reviewed under the "arbitrary and capricious" standard, and the Court will uphold the decision if it is "the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Id.* at 587. Similarly, the Court will give deference to a state commission's resolution of state law issues, applying an arbitrary and capricious standard in its review. *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs.,* 323 F.3d 348 (6th Cir.2003).

## III. DISCUSSION

BellSouth argues that the PSC erred because the conversion of special access services to combinations of unbundled networks constitutes a "termination" under the agreement and that it is improper under Kentucky contract law to permit AT & T to escape its obligations under the contract. Further, argues BellSouth, the decision of the PSC violates the Contract Clause contained in Article I of the U.S. Constitution. For the reasons stated below, the Court disagrees and affirms the decision of the PSC.

BellSouth first contends that the PSC wrongly concluded that no termi-

nation took place and suggests that the a recent FCC order settles the "termination" question by providing that:

> As an initial matter, we remain unconvinced by the general argument advanced by several commenters that converting a special access circuit to a UNE does not constitute a termination within the meaning of the termination provisions of incumbent LEC tariffs.

*Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* 18 FCC Rcd. 16,978, ¶ 695 (2003) (hereinafter, *"Triennial Review Order"*). While BellSouth takes the position that the *Triennial Review Order* completely undermines the rationale of the PSC, the Court remarks that the FCC has rejected the proposition that conversion does not equal termination only as a general matter. The facts of a particular case may well demonstrate that a particular conversion of a special access circuit to a UNE qualifies as a termination. Plaintiff does not dispute that AT & T will continue to be a customer of BellSouth upon such a transition and that, indeed, from all appearances nothing at will change in the operations of the parties. Accordingly, deferring to the fact-finding of the PSC, this Court must conclude that this is one of those scenarios where the conversion does not work a termination.

■ Even if there was no "termination," BellSouth maintains that AT & T remains subject to the liability provision of the contract because AT & T agreed to a specified term and minimum monthly revenue and must pay the penalty if it fails to meet the minimum revenue condition. Whether or not Defendant AT & T's actions result in insufficient revenue after the conversion, the Court finds that the

PSC properly determined that imposition of the penalty would be inappropriate.[4]

47 U.S.C. § 251(c)(3) has imposed on all ILECs at all relevant times, including BellSouth, the following requirements:

> The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252. An [ILEC] shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

47 U.S.C. § 251(c)(3). In relationship to this legislative provision, the FCC promulgated Rule 315(b), providing that:

> Except upon request, an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines.

47 C.F.R. § 51.315.

In its January 25, 1999, opinion in *AT & T Corp. v. Iowa Utilities Bd.,* the Supreme Court discussed the obligations to provide existing combinations imposed on ILECs by § 251(c)(3) in light of Rule 315(b), stating that:

> The reality is that §§ 251(c)(3) is ambiguous on whether leased network elements may or must be separated, and the rule the Commission has prescribed [315(b)] is entirely rational, finding its basis in §§ 251(c)(3)'s nondiscrimination requirement. As the Commission explains, it is aimed at termination.

---

4. Indeed, the same would be true if it were determined that the conversion constituted a

preventing incumbent LECs from "disconnect[ing] previously connected elements, over the objection of the requesting carrier, not for any productive reason, but just to impose wasteful reconnection costs on new entrants." Reply Brief for Federal Petitioners and Brief for Federal Cross–Respondents 23. It is true that Rule 315(b) could allow entrants access to an entire preassembled network. In the absence of Rule 315(b), however, incumbents could impose wasteful costs on even those carriers who requested less than the whole network. It is well within the bounds of the reasonable for the Commission to opt in favor of ensuring against an anticompetitive practice. *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 395, 119 S.Ct. 721, 142 L.Ed.2d

835 (1999). Accordingly, when the contract tariff was executed in June 1999, the Supreme Court had already reviewed and upheld ILECs' obligations to provide existing combinations of UNEs under 51.315(b).[5]

Since that time, the FCC has addressed the issue of contractual liability payments as follows:

> Nothing in section 251 mandates that the Commission deny incumbent LEC's termination liability payments to which they are entitled under contracts in the event of an EEL conversion. As noted above, contracts that provide for term pricing and early termination penalties may benefit both parties and thus do not represent the type of impediment or restriction to access that section 251 prohibits.[6] While we agree that incumbent

---

**5.** There is no merit to BellSouth's argument that it was under no obligation to provide combined UNEs to CLECs until the 2002 decision of the Supreme Court in *Verizon v. FCC*, reinstating Rules 51.315(c)-(f) vacated by the Eight Circuit's decision in *Iowa Utilities Board v. FCC. See Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *Iowa Utilities Board v. FCC*, 120 F.3d 753 (8th Cir.1997). Rules 51.315(c)-(f) govern new combinations of UNEs. In fact, that portion of the 8th Circuit Court of Appeals' *Iowa Utilities Board* decision vacating Rule 51.315(b), concerning *existing* combinations of UNEs, had already been overturned by the Supreme Court in *AT & T Corp. v. Iowa Utilities Bd.*, as discussed above. *See AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 395, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

In any event, the Court notes with interest the FCC's description of the state of the law on the issue of existing combined UNEs shortly after the January 1999 decision in *Iowa Utilities Bd.* In its November 5, 1999, *Third Report and Order*, the FCC commented that "any substitution of unbundled network elements for special access would require the requesting carrier to pay any appropriate termination penalties required under volume or term contracts..." because "under *existing* law, a requesting carrier is entitled to obtain existing combinations of loop and transport between the end-user and the ILECs serving wire center on an unrestricted basis at unbundled network element prices." *Third Report and Order* at ¶ 486 and n. 985 (emphasis added). Certainly, this FCC Order post-dates the execution of the June 1999 agreement of BellSouth and AT & T, but neither party has addressed nor has this Court identified a change in the law for existing combined UNEs between the time that the Supreme Court rendered its decision in January 1999 and the FCC's November 5, 1999, assessment of the state of the law.

**6.** Indeed, the FCC noted that:

> As a general matter, early termination provisions can be mutually beneficial. Providers are given a measure of certainty because such penalty provisions ensure that costs will be recouped in the event a customer fails to utilize the service for a stipulated period of time. On the other hand, customers enjoy discounted and stable priced services over the life of the contract term.
>
> . . . . .
>
> We note that linking a price discount to a contractual term is a reasonable, accepted commercial practice, both inside and outside of the telecommunications industry.

*Triennial Review Order* at ¶¶ 692, 698.

LECs are not permitted to establish unilateral barriers that work to restrict access to UNEs, that is not the case here. The termination penalties were established by a process of bilateral negotiation or arbitration, not fiat.

*Triennial Review Order* at ¶ 697. The FCC continued, stating that:

It is the specific application of such provisions, rather than the very existence, that could offend the Communications Act. Determining whether such provisions were applied unlawfully is a fact-intensive inquiry. In light of the likely marketplace disruption of adopting a fresh look policy along with the lack of specific evidence on the record, we are not convinced that the abrogation of the negotiated terms will be in the public interest in this instance. We, nevertheless, caution incumbent LECs that their ability to apply termination penalties is not unfettered. We concur with the conclusion in the *UNE Remand Order* "that any substitution of unbundled network elements for special access would require the requesting carrier to pay any *appropriate* termination penalties required under volume or term contracts." Thus, to the extent a carrier can provide more specific evidence that incumbent LEC termination penalties are inappropriate, we will resolve such a

matter through an enforcement proceeding.

*Id.* at ¶ 698.

As described above, at the time the parties to this matter entered into their contract in June 1999, the Telecommunications Act and applicable federal rules contemplated that carriers would be able to obtain existing combinations of UNEs. If existing combinations of UNEs were offered, interconnection negotiations would result in a real choice between using those existing combinations of UNEs and making special access arrangements. AT & T was deprived of such a choice because BellSouth steadfastly refused to provide combinations of UNEs.[7] It was the opinion of the PSC that BellSouth should not be permitted to benefit from its failure to comply with those orders. This Court agrees. To hold otherwise, would permit BellSouth to impede competition in contravention of its obligations under the Act. The penalties sought from AT & T are simply not appropriate based on the evidence presented, and the decision of the PSC is in keeping with applicable federal law.

 Finally, with regard to the Contract Clause, BellSouth asserts that the PSC's decision impaired the enforcement of its existing contract and, thus, violated its rights under Article I, § 10 of the United States Constitution. In fact, the Contract Clause provides that "[n]o State

---

**7.** It is for this reason that BellSouth's reliance on *Connecticut Valley Electric Co., Inc. v. FERC* is misplaced. *See Connecticut Valley Electric Co., Inc. v. FERC*, 208 F.3d 1037 (D.C.Cir.2000). Certainly, even in the regulatory context, parties are bound by express contractual obligations even if subsequent events change the circumstances. Nonetheless, the situation described in *Connecticut Valley*, under the Public Utility Regulatory Policies Act of 1978, was one where the law was ambiguous as to whether one party was a particular kind of qualifying facility at the

time the parties negotiated the contract in question. Due to that ambiguity, the D.C. Circuit affirmed the Federal Energy Regulatory Commission's decision that a subsequent decision that the party was not a qualifying facility did not affect the pre-existing contract. The D.C. Circuit opined that the parties could have included a specific reservation in the contract permitting a change in the event of a subsequent change in the interpretation of the law. This is simply not the case in the instant matter. The prerequisite—ambiguity of the law—is absent.

shall...pass any...law impairing the Obligation of Contracts." U.S. Const., Art. I., § 10. When inquiring into a purported violation, the Court must first determine whether a "state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Company v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). While the clause addresses interference with the performance of already existing contracts by state and local governments, it does so by forbidding the passing of state or local law that would interfere with existing contracts. By its own terms, the clause does not apply to laws enacted by the federal government. As the Court understands Plaintiff's argument, BellSouth is concerned with the application of federal law to its situation by the PSC. Thus, the instant matter is outside the purview of the Contract Clause, and there is no merit to BellSouth's argument.

## IV. CONCLUSION

For the reasons stated above, the decision of the PSC shall be affirmed.

Accordingly, **IT IS ORDERED:**

(1) that the decision of the PSC be, and the same hereby is, **AFFIRMED;**

(2) that this matter be, and the same hereby is, **STRICKEN FROM THE ACTIVE DOCKET.**