# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 22, 2004    Reissued February 11, 2005

No. 03-1206

ARIZONA CORPORATION COMMISSION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARIZONA PUBLIC SERVICE COMPANY, ET AL.,
INTERVENORS

———

Consolidated with
03-1209

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Richard M. Lorenzo* and *David W. D'Alessandro* argued the cause for petitioners and intervenor Southwest Gas Corporation. With them on the briefs were *Janice Alward, Timothy J. Sabo, Barbara S. Jost, Kelly A. Daly, Joel L. Greene, Donald G. Avery, Andrew B. Kolesar, III., James H. McGrew, J. Michel Marcoux, John P. Gregg, Irving Jacob Golub, Melissa E. Maxwell, James F. Moriarty, Douglas M.*

*Canter,* and *Steven J. Kalish. Janet F. Wagner* and *William A. Mogel* entered appearances.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor. *Lona T. Perry* and *Laura J. Vallance*, Attorneys, entered appearances.

*Kenneth M. Minesinger* argued the cause for intervenor El Paso Natural Gas Company. With him on the brief were *Seth M. Galanter* and *Matthew C. Schruers.*

*Katherine B. Edwards, John Paul Floom, Harvey Y. Morris, Gordon J. Smith, Paul B. Mohler, Frank R. Lindh, John R. Ellis, David J. Gilmore, Kevin J. Lipson, Douglas L. Beresford, Douglas Kent Porter, and Joseph S. Koury* were on the brief for intervenors. *Michael A. Stosser, Arocles Aguilar, Stephen E. Pickett, John P. Beall, Frederick T. Kolb,* and *Bruce A. Connell* entered appearances.

Before: GINSBURG, *Chief Judge,* and SENTELLE, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge:*[1] Petitioners, a group of natural gas shippers, challenge three FERC orders that modify the terms—set in 1990 and 1996 Settlements—under

---

[1] We issued our decision in this case by order and memorandum on December 28, 2004. We issue it today in opinion form on motion of a party, changed only by the addition of the second paragraph as background explanation.

which petitioners ship natural gas over the lines of El Paso Natural Gas Company. *El Paso Natural Gas Co.*, 99 FERC ¶ 61,244 (2002) ("May 2002 Order"); *El Paso Natural Gas Co.*, 100 FERC ¶ 61,285 (2002) ("September 2002 Order"); *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045 ("July 2003 Order"). Most relevant to this case, FERC converted petitioners' contracts from full requirements ("FR") to contract demand ("CD") arrangements, thereby obligating them to pay for additions to capacity necessitated by growth in their demand. Petitioners argue that the orders did not meet the *Mobile-Sierra* public interest standard set forth in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956). We find no error in FERC's orders. The Commission did not merely protect El Paso from an "improvident bargain," as petitioners allege, but exercised its *Mobile-Sierra* authority to prevent "the imposition of an excessive burden" on third parties. *Northeast Utils. Serv. Co. v. FERC*, 55 F.3d 686, 691 (1st Cir. 1995) (internal quotation marks and citation omitted).

\* \* \*

El Paso's pipeline delivers natural gas from three production basins—San Juan, Permian, and Anadarko—to California and several nearer states. The 1990 Settlement preserved FR service, but converted El Paso's FR sales customers to FR transportation customers and allocated pipeline capacity pro rata among firm shippers. By 1996, El Paso had accumulated substantial excess capacity because Californian local distributors, under state orders, had turned back their rights. Accordingly the parties adopted a new 1996 Settlement, setting current rates and terms to prevail until 2006. Under that Settlement, the reservation charges of the CD shippers were based on the capacity they reserved, while

the FR shippers' were based on 1996 "billing determinants." Nonetheless, the FR shippers remained free, as the name "full requirements" suggests, to insist that El Paso meet their full requirements. After the 1996 Settlement, El Paso's capacity surplus dwindled, making service unreliable and triggering pro rata cutbacks. FERC responded in the May 2002 Order by requiring, among other things, that all major FR shippers convert to CD contracts. In the September 2002 Order it set the conversion price when FR shippers and El Paso could not agree, and in the July 2003 Order it finalized the details of conversion and denied rehearing. Petitioners now appeal the orders.

\* \* \*

The main factual question is whether the record contains substantial evidence of capacity curtailments on El Paso's mainline severe enough to render firm service unreliable and thus justify Commission action under *Mobile-Sierra*. FERC cites numerous sources to answer in the affirmative. One FR shipper, Southwest Gas Corporation, had, "[f]or ten years, . . . complained about firm service degradation by El Paso." Southwest's experience was apparently common: another group of shippers, for example, complained that its "customers for at least [a] year . . . experience[d] cutbacks in scheduled quantities due to capacity constraints, regardless of the supply basin accessed. . . . El Paso's overtaxed mainline system is reaching the breaking point." El Paso, too, took the position that it lacked "sufficient capacity . . . to serve . . . [customers'] aggregate capacity rights."

Petitioners, in turn, identify holes in FERC's evidence. They argue that FERC failed to quantify the curtailments and instead relied only on a data response sheet and customers' comments. The capacity shortfalls, they insist, arose from

"aberrational" events such as the California energy crisis and an explosion in El Paso's pipeline at Carlsbad, New Mexico. Reply Brief at 18-19. Indeed, one El Paso executive said in April 2002 that "the main line . . . is not really curtailing very often." Petitioners contend that at a minimum FERC should have conducted a hearing to verify the scope and origin of El Paso's capacity problems.

But "[t]he question . . . is not whether record evidence supports [petitioners'] version of events, but whether it supports FERC's." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003). Admittedly, FERC's investigation of the mainline curtailments could have been more searching. But its decision does not lack substantial evidence simply because petitioners offered "some contradictory evidence." *Id*. We are especially reluctant to second-guess FERC's findings because many of the present petitioners themselves moved for a summary FERC ruling that El Paso "lacks up to 1.1 Bcf of mainline capacity needed to serve . . . its existing firm customers." Motion for Partial Summary Disposition by Texas, New Mexico and Arizona Shippers, at 1. A complaint filed by most of the present petitioners alleged that customers of the El Paso System were experiencing cutbacks due to capacity constraints regardless of the supply basin accessed. That most of the petitioners changed positions suggests, as argued by the joint brief of multiple intervenors in support of FERC, that their real complaint is only against the remedy FERC chose. Joint Brief of Intervenors at 19.

Affidavits from the staff of the petitioner firms, moreover, made clear that remedying the curtailments required that El Paso newly "path[]" its system, with receipt, mainline, and delivery point rights allocated "on a fair basis." Joint Brief of Intervenors at Ex. A (July 12, 2001 Affidavit of

Donald C. Lindquist). That is, simply waiting for aberrant events to subside would not suffice. Nor do petitioners persuade us that El Paso improperly withheld capacity. FERC observed, and petitioners did not disprove, that El Paso operated its "dynamic" pipelines at reasonable levels of capacity. July 2003 Order, 104 FERC at 61,158-62, ¶¶ 62-76.

Even assuming some doubt remains regarding the exact scope of El Paso's mainline curtailments, FERC could reasonably find that petitioners' contracts posed an unusual threat to the public interest. The problem was what FERC called the "unrestricted growth rights under the FR contracts." *Id*. at 61,152, ¶ 30. Whereas El Paso could charge cost-based rates to CD shippers who requested additional capacity to serve increased demand, El Paso was obligated to provide petitioners additional service on demand at rates locked in by the 1996 Settlement and reflecting El Paso's excess capacity at that time. That excess eroded thanks to intervening changes. Only the CD rates related closely to current conditions, yet the CD shippers were exposed to the curtailments every bit as much as the FR shippers were.

Petitioners respond that CD growth actually outstripped FR growth, and object to FERC's focus on the latter. But FERC explained its focus on the FR contracts quite logically. The Commission recognized that there was not "a single cause of the capacity crisis." May 2002 Order, 99 FERC at 62,002. This is obviously quite realistic, since every molecule shipped in a peak period plays a role in creating the need for expanded facilities able to carry the entire peak load. Cf. *Town of Norwood v. FERC*, 962 F.2d 20, 25-26 (D.C. Cir. 1992). But FERC found that FR growth was "the most significant part of the problem and any solution must tie future growth in FR customers' demands to appropriate allocations of costs related to those demands as

well as to capacity expansions. . . . [I]ncreases [in FR usage] take place without any added revenue responsibility and provide no incentive for El Paso to build additional facilities." May 2002 Order, 99 FERC at 62,003. In other words, FERC believed that it should address primarily those streams of gas whose growth, under the terms prevailing before the modification, was not "tie[d]" to sound cost allocation and incentives. See also July 2003 Order, 104 FERC at 61,170-71, ¶¶ 113-17.

Petitioners' complaint that their consumption growth rates are somewhat "heterogeneous" (Reply Brief at 7) is no answer. The *Mobile-Sierra* doctrine permits generalized findings of public interest when intervening circumstances affect a class of contracts in the same manner. *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 710 (D.C. Cir. 2000); see also *Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002) ("*proportionality* between the identified problem and the remedy is the key"). Whatever the heterogeneity in growth rates, petitioners' contracts *all* enabled them to use capacity that cost more—both in opportunity cost (the foregone uses of the CD shippers) and in out-of-pocket cost (the pipeline expansion costs for El Paso)—than they were obliged to pay. Consequently, unless El Paso were required to eat the extra cost, the FR contracts would jeopardize firm service for other shippers.

Petitioners also offer two arguments why they believe FERC was arbitrary and capricious in selecting a remedy—a matter on which FERC wields maximum discretion, *Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1044 (D.C. Cir. 2000) (citing *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967)). The first argument is that FERC left them with access to less natural gas than their historic

needs demanded. But in fact FERC assigned each FR customer (but one) capacity—priced at the Settlement rates—in excess of its 2001 non-coincident peak demand, and made available to other FR shippers capacity that had been initially allocated to FR customers who said their allocation *exceeded* what they would like. July 2003 Order, 104 FERC at 61,148, ¶ 2; 61,164-65, ¶¶ 82-84, 88; 61,186, App. B. Petitioners do not question FERC's explanation for the single exception. See *id*. at 61,164-65 n.84.

Petitioners' second objection is that El Paso reneged on its obligations to expand capacity. Section 3.6 of the 1990 Settlement requires El Paso to add capacity "to satisfy the demands of a converting [FR] customer . . . ; provided, however, that El Paso shall not be required to construct any facilities that are not economically justifiable." Section 16.3 of the 1996 Settlement, however, requires El Paso to "maintain and operate facilities sufficient to satisfy . . . [its] service obligations . . . ." See *id*. at 61,167, ¶ 97. Petitioners read these terms to mean that El Paso must add capacity on demand, provided El Paso could eventually recoup its costs.

FERC, however, cited several reasons why § 3.6 both trumps § 16.3 and does not entitle petitioners to construction on the scale they seek. The principal reason, which petitioners' appeal does not directly address, is that "[t]he language of Section 16.3 is general in nature and does not supercede the specific 1990 Settlement." July 2003 Order, 104 FERC at 61,168-69, ¶ 106. By this reading, El Paso's § 16.3 obligation to maintain its pipelines does not rewrite its conditional § 3.6 obligation to add capacity.

In seeking to reconcile the two sections, petitioners' argument for rehearing before the Commission presented an obscure interpretation of § 3.6's reference to "economically

justifiable" capacity additions. Petitioners left unclear whether El Paso would be really made whole (including recovery of the return on investment for the period between construction and the filing of new, post-Settlement rates), and how cost responsibility would be matched with cost causation for different classes of users. See Joint Request for Rehearing and Clarification, July 1, 2002 ("Joint Request") at 24-28. Cf. *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 596 & n.5 (6th Cir. 2001) (discussing the elusiveness of "economically justifiable"). Petitioners thus made no effort at all to offer an interpretation that could have both preserved their FR contracts and met FERC's concern for the incentives the contracts created—which was, after all, the basic rationale for the exercise of its *Mobile-Sierra* authority.

Interpretations of the Settlements aside, some petitioners raise one issue on which the order on rehearing was silent. Arizona Public Service Company and Pinnacle West Energy Corporation (APS/PWEC) argue that they invested over $1 billion in new electric generation facilities in reasonable reliance on the 1996 Settlement and Transportation Service Agreement ("1996 TSA") with El Paso. Specifically, APS/PWEC argue that El Paso agreed in § 8.3 of the 1996 TSA to construct such facilities as might be needed to supply their proposed Redhawk Power Plant. Petitioners' Brief at 43-44; Joint Request at 29 & n.20. Section 8.3(c) provides, inter alia, that the cost of newly constructed mainline facilities "shall be included in El Paso's cost of service with the ratemaking treatment thereof to be determined by [FERC]. . . ."

But this drive-by allusion to § 8.3—the only part of the 1996 TSA contained in the record—does not get APS/PWEC where they want to go. APS/PWEC's request for rehearing did not explain how FERC should reconcile § 8.3

with other provisions of the 1990 and 1996 Settlements, nor did it offer any interpretation that would reconcile petitioners' views with the Commission's concern for well calibrated incentives.  Consequently, we reject APS/PWEC's argument, reminding them that "the Commission cannot be asked to make silk purse responses to sow's ear arguments." *City of Vernon v. FERC*, 845 F.2d 1042, 1047 (D.C. Cir. 1988).